## H. A. & L. D. HOLLAND CO. v. NORTHERN PAC. RY. CO.

(District Court, E. D. Washington, N. D. May 31, 1913.)

No. 1,580.

1. PUBLIC LANDS (§ 92*)—RIGHT OF WAY OVER PUBLIC LANDS—CONSTRUCTION OF GRANT.

Under Act July 2, 1864, c. 217, 13 Stat. 365, granting to the Northern Pacific Railroad Company right of way 400 feet wide over the public lands "for the construction of a railroad and telegraph," it acquired the land embraced in such right of way for railroad purposes only, and had no power to dedicate the entire right of way, so acquired over a government subdivision of land, as a public street, reserving to itself only the right to operate its tracks over the street; and its power in that regard was not enlarged by the fact that it acquired title to the remainder of the section under the subsidy grant contained in the same act, the two grants being separate and distinct.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 276–282; Dec. Dig. § 92.*]

2. DEDICATION (§ 19*)—BY DEED—CONSTRUCTION OF PLAT.

A railroad company, as owner of a tract of land over which its line was built and on which was its station and side tracks, platted the same as an addition to a town. The plat showed the tracks and a strip of land lying on both sides 225 feet in width and designated as "Railroad Street." The dedicatory language of the plat was as follows: "The streets shown by said plat are dedicated to be used by the public until lawfully vacated, except that strip of land 225.7 feet in width designated as 'Railroad Street,' which is reserved for the tracks and use of said railroad company." Held, that the plat did not constitute a dedication of such strip as a public street, although it showed lots fronting thereon.

[Ed. Note.—For other cases, see Dedication, Cent. Dig. §§ 35, 37–47; Dec. Dig. § 19.*]

3. DEDICATION (§ 20*)—COMMON-LAW DEDICATION—ACQUIESCENCE IN PUBLIC USE.

The temporary use of unoccupied portions of a railroad right of way by the public or adjoining owners for street purposes held not to constitute a common-law dedication of the land as a street by the railroad company, where as fast as required it was occupied by the company and its lessees with structures used in connection with its railroad business.

[Ed. Note.—For other cases, see Dedication, Cent. Dig. §§ 17–30; Dec. Dig. § 20.*

For other definitions, see Words and Phrases, vol. 2, pp. 1908–1917; vol. 8, pp. 7629, 7630.]

4. DEDICATION (§ 21*)—BY ESTOPPEL—SALE OF LOTS.

The sale of lots in accordance with a plat which showed them fronting on a strip of land occupied by railroad tracks held not to constitute a dedication of such strip as a street by estoppel, where by the dedicatory language of the plat it was expressly reserved for railroad purposes.

[Ed. Note.—For other cases, see Dedication, Cent. Dig. §§ 50–54; Dec. Dig. § 21.*]

In Equity. Suits by the H. A. & L. D. Holland Company, by George Turner and wife, by H. J. Shinn and wife, and by W. H. Kiernan and wife, against the Northern Pacific Railway Company. Decrees for defendant.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Turner & Geraghty and Post, Avery & Higgins, all of Spokane, Wash., for plaintiffs.

Cannon, Ferris & Swan and Graves, Kizer & Graves, all of Spokane, Wash., for defendant.

RUDKIN, District Judge. These several bills were filed by the owners of certain lots abutting on Railroad street in the city of Spokane to restrain the Northern Pacific Railway Company from elevating its tracks in Railroad street in front of their property and for other appropriate relief. By consent of parties the suits were consolidated for the purposes of trial, and the record made at the hearing discloses substantially the following facts:

By the first section of the Act of Congress of July 2, 1864 (13 Stat. 365, c. 217), the Northern Pacific Railroad Company was created a corporation and was empowered to construct and maintain a continuous railroad and telegraph line from a point on Lake Superior to some point on Puget Sound. By the second and third sections of the act it was provided, among other things, as follows:

"Sec. 2. And be it further enacted, that the right of way through the public lands be, and the same is hereby, granted to said Northern Pacific Railroad Company, its successors and assigns, for the construction of a railroad and telegraph as proposed; and the right, power, and authority is hereby given to said corporation to take from the public lands, adjacent to the line of said road, material of earth, stone, timber, and so forth, for the construction thereof. Said way is granted to said railroad to the extent of two hundred feet in width on each side of said railroad where it may pass through the public domain, including all necessary ground for station buildings, workshops, depots, machine shops, switches, side tracks, turntables, and water stations; and the right of way shall be exempt from taxation within the territories of the United States. * * *

"Sec. 3. That there be, and hereby is, granted to the Northern Pacific Railroad Company, its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific Coast, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores, over the route of said line of railway, every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile, on each side of said railroad line, as said company may adopt, through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad whenever it passes through any state, and whenever on the line thereof, the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption, or other claims or rights, at the time the line of said road is definitely fixed, and a plat thereof filed in the office of the commissioner of the general land office."

The railroad company signified its acceptance as provided in the act, and on the 4th day of October, 1880, the line of the road was definitely fixed through the north half of section 19, township 25 north, of range 43 east of the Willamette meridian, and a plat thereof filed in the office of the Commissioner of the General Land Office. At that time the United States had full title to the north half of section 19, and the same was not reserved, sold, granted, or otherwise appropriated, and was free from pre-emption and other claims or rights. On the 20th day of January, 1881, the company, through its agent and general su-

perintendent, filed a town plat of Railroad addition to Spokane Falls, which embraced the half section in question. The line of road as definitely located ran in an easterly and westerly direction through the center of this plat. The tract of land thus platted is four blocks in width, extending from Sprague avenue on the north to Third avenue on the south, and approximately ten blocks in length, extending from Washington street on the east to Cedar street on the west. There is a strip of land on the plat designated as "Railroad street," 225.7 feet in width and extending through the plat from east to west. The main line of the railroad was indicated on this plat, with two side tracks two blocks in length on either side near the depot, which was situate on Lincoln street, about the center of the plat east and west, and about the center of Railroad street. The dedicatory language of the plat reads as follows:

"The streets shown by said plat are dedicated to be used by the public until lawfully vacated, except that strip of land 225.7 feet in width designated as 'Railroad Street,' which is reserved for the tracks and use of said railway company."

In the latter part of the year 1881 the railroad was constructed along the line of definite location about the center of Railroad street, with two short side tracks near the depot, as indicated on the plat of Railroad addition, and little further use was made of the street by the railroad company until after the town was destroyed by fire in the year 1889. At the time the plat was filed the town contained a population of from 300 to 500, at the time of the fire in 1889 a population of from 12,000 to 15,000, and at the time of the trial a population estimated at 125,000. Prior to the fire the business portion of the town was located almost wholly, if not entirely, north of Railroad street. Soon after the construction of the railroad a number of buildings were erected upon the tier of lots facing Railroad street on the south and fronting on the railroad track, including one or more hotels, lodging houses, saloons, restaurants, barber shops, etc. The location of these buildings with reference to the lot lines on Railroad street does not very clearly appear from the testimony. Upon the tier of lots facing Railroad street on the north were a few residences, some of which at least fronted upon Railroad street. In the early history of the town Howard street was practically the only cross-street open to public travel, and those having business with the railroad company from the town passed south on Howard street to its intersection with Railroad street, and thence westerly along Railroad street to the depot, a distance of about two blocks. Those residing or having business places fronting on Railroad street used the street for the purpose of ingress and egress to and from their residences or places of business. Railroad street was thus used by the general public, and by whomsoever wished to pass over it, from the year 1881 until the year 1889 for a distance of five or six blocks, and I might add in passing that other vacant property in the vicinity was used for the like purpose and in substantially the same manner. Since the year 1889 the street has been used but little, except by those having business directly with the railroad company in loading or unloading freight. Since that time

the tier of lots on the south side of the street has been built up almost solid, principally with warehouses and wholesale houses, although some retail business is transacted by houses having a frontage on the cross-streets. A side track runs along in front of these business houses a few feet distant therefrom, and the buildings usually have a platform in front extending to the side track for the purpose of receiving freight.

Commencing in the year 1891 the railroad company began to lease the northerly 100 feet of Railroad street for wholesale and warehouse purposes, and at the present time the greater part of the northerly 100 feet of the street through this addition is occupied by brick buildings from two to four stories in height, constructed at a cost of many thousand dollars. So far as the record discloses the public authorities of the city of Spokane have never asserted any rights in Railroad street, or exercised any control or supervision over it. On the contrary, they have levied special assessments against the property in the so-called street for street improvements from time to time, and the railroad right of way has always been taxed for state, county, and municipal purposes. Portions of the northerly 100 feet of the street have been occupied and blockaded by buildings, for a period of more than 20 years, without any protest on the part of the city, and with only an occasional protest on the part of an abutting property owner, who took no legal steps to protect his rights in the street, if any such he had. That portion of Railroad street not occupied by buildings is, at the present time, very largely occupied by railroad tracks, as will appear from an inspection of the numerous photographs and plats received in evidence. There are upwards of 100 train movements daily at the different street crossings in the city of Spokane, and at some of these crossings public travel is impeded and human life endangered to a greater or less extent. Under these circumstances, on the 6th day of February, 1912, the city of Spokane by ordinance directed and ordered the Northern Pacific Railway Company (successor in interest to the Northern Pacific Railroad Company) to separate its grade from the street grades of the city between Sprague avenue and Division street on the east and Sixth avenue on the west (which includes the entire distance through Railroad addition). This the railroad company proposes to accomplish by a dirt fill approximately 15 feet in height and 85 feet in width, sustained by retaining walls of concrete or stone masonry on either side. To prevent the elevation of the tracks and the obstruction of Railroad street in this manner in front of their several lots, the plaintiffs have instituted these suits as already stated.

Under the foregoing facts the plaintiffs contend that Railroad street is a public highway—first, by statutory dedication; second, by common-law dedication; and, third, by estoppel. The defendant, on the other hand, contends that there has been no dedication, either common-law or statutory, and, furthermore, that its predecessor in interest could not lawfully make such a dedication under the implied limitations contained in the grant of its right of way from the federal government. The legal status of this strip of land is therefore the principal question in the case. If it is a public street, it is conceded that the municipality could not give it over to the exclusive use and occu-

pation of the railway company, and such would be the necessary effect of elevating the tracks according to the plan above outlined. State ex rel. Schade Brewing Co. v. Superior Court, 62 Wash. 96, 113 Pac. 576. If, on the other hand, it is the private right of way of the railway company it may lawfully elevate its tracks therein against the will and protest of abutting property owners, and if they suffer injury therefrom they have their right of action at law. The latter is their only remedy, for the damages are entirely too remote, uncertain, and speculative to warrant a court of equity in granting injunctive relief in advance of the change.

[1] If there has been no dedication of this strip of land called Railroad street to the use of the public, the power of the railroad company to make such a dedication is not necessarily involved in these cases; but nevertheless the nature of the company's right of way acquired under the act of Congress, and the limitations upon its use imposed by Congress, may well be taken into consideration in determining the ultimate question at issue, viz., the question of dedication or no dedication. In Northern Pacific Railroad Co. v. Smith, 171 U. S. 260, 275, 18 Sup. Ct. 794, 799 (43 L. Ed. 157), the court said:

"By granting a right of way 400 feet in width, Congress must be understood to have conclusively determined that a strip of that width was necessary for a public work of such importance."

The doctrine of that case was reaffirmed in Northern Pacific Railway Co. v. Townsend, 190 U. S. 267, 23 Sup. Ct. 671, 47 L. Ed. 1044; the court declaring that neither courts nor juries, nor the general public, may be permitted to conjecture that a portion of such right of way is no longer needed for the use of the railroad, and title to it has vested in whomsoever chooses to convey the same.. The court further said:

"Manifestly the land forming the right of way was not granted with the intent that it might be absolutely disposed of at the volition of the company. On the contrary, the grant was explicitly stated to be for a designated purpose, one which negated the existence of the power to voluntarily alienate the right of way or any portion thereof. The substantial consideration inducing the grant was the perpetual use of the land for the legitimate purposes of the railroad, just as though the land had been conveyed in terms to have and to hold the same so long as it was used for the railroad right of way. In effect the grant was of a limited fee, made on an implied condition of reverter in the event that the company ceased to use or retain the land for the purpose for which it was granted. * * * Congress having plainly manifested its intention that the title to and possession of the right of way should continue in the original grantee, its successors and assigns, so long as the railroad was maintained, the possession by individuals of portions of the right of way cannot be treated without overthrowing the act of Congress as forming the basis of an adverse possession which may ripen into a title good as against the railroad company."

At the same time it was not denied that the right of way granted through the public domain within a state was amenable to the police power of the state, the court saying:

"Congress must have assumed, when making this grant, for instance, that in the natural order of events, as settlements were made along the line of the railroad, crossings of the right of way would become necessary, and that other limitations in favor of the general public upon an exclusive right of occupancy by the railroad of its right of way might be justly imposed. But

such limitations are in no sense analogous to claims of adverse ownership for private use."

If the authority of the railroad company to dispose of any part of its right of way of its own volition is measured by what it may be compelled to do under the police power of the state—and in my opinion its authority is thus restricted—the company was without authority to devote its entire right of way across the prairie for a distance of ten blocks to the use of the public for a public street, reserving to itself only the right to operate its tracks over the street. It seems manifest that under the laws of the state the entire right of way of the railroad company could not be condemned for a public street, leaving to the company only the limited right to operate its trains therein, thus converting what is to all intents and purposes a fee-simple title into a mere license from municipal authorities. North Coast R. Co. v. Northern Pac. R. Co., 48 Wash. 529, 94 Pac. 112, falls far short of supporting any such doctrine.

I am therefore of opinion that it was without the power of the company to dedicate its entire right of way as a public street, and that such a dedication would be utterly void, if attempted. Nor can I agree with counsel that the railway company holds its right of way through odd sections by any other or different tenure from that by which it holds its right of way in even sections, or that it has any greater authority to dispose of the one part than of the other. The act of 1864 contains two separate and distinct grants, the one of the right of way, and the other of land in aid of the construction of the road, and the one grant is not dependent upon or merged in the other. Railroad Co. v. Baldwin, 103 U. S. 426, 26 L. Ed. 578.

[2] The grant of the right of way is an entirety, and is held throughout by the same tenure and subject to the same limitations. The statutory dedication made by the railroad company is consistent with this view. There is no magic in the use of the word "street." The entire plat, including the dedication, must be construed together, and when so construed it plainly appears that the strip of land, ill-advisedly designated as a street, was in fact excepted from the dedication and reserved for the tracks and use of the railway company. It is no doubt true that the use of a strip of land as a mere right of way for a railroad is not entirely incompatible with the use of the same strip of land as a public street; but at the same time its use for other legitimate railroad purposes would be. Furthermore, such common user is so impracticable and so hazardous that a court should not readily presume that it was authorized or intended.

[3] The use made of this strip of land from 1881 to 1889 was but natural under the circumstances, and was wholly insufficient of itself to constitute a common-law dedication. The law on that subject is very clearly and concisely stated in the headnotes to Hogue v. City of Albina, 10 L. R. A. 673, prepared by Mr. Justice Bean, now of the district of Oregon.

"In order to constitute a dedication by parol, there must be some acts proved evidencing a clear intention to dedicate the land to the public use.

"Where it is sought to establish a dedication by parol, there must be some acts. proved evidencing a clear intention to dedicate the land to the public use.

"Where it is sought to establish a dedication by the sale of lots with reference to a map or plat, the extent of such dedication is to be determined from the consideration of the whole map, the object being to ascertain the intention of the donor, the cardinal rule of construction being to give effect to .the intention· of the party as manifested by his acts.

"A dedication of land to the public use is not presumed, but must appear by acts and declarations of the owner of such a public and deliberate character as clearly show an intention on his part to surrender his land for the use of the public, and the burden of proof is upon the party asserting such dedication.

"In order to constitute a common-law dedication, the owner's acts and declarations must be deliberate, unequivocal, and decisive, manifesting a positive and unmistakable intention to permanently abandon his property to the 'public use.

"When the owner of land lays out a town and records a plat thereof, on which streets are dedicated to the public, and it is sought to establish another and different dedication by the acts and .conduct of the owner, in exhibiting to intending purchasers another map prepared on the same day, and selling lots by reference to the second plat, such second plat, to have this effect, must be essentially different from the recorded one, showing on its face an intention on the part of the owner to make an additional dedication." ·

[4] The sale of lots with reference to the plat in question does not create an estoppel; for, while the plat showed Railroad Street, it also showed plainly that it was not a street in fact, but was excepted and reserved for the tracks and use of the railway company. Indeed, it would be far easier to raise an estoppel against the property owners who have stood by during all these years while permanent and lasting improvements were under way at great expense on property which they now lay claim to as a public street.

It was suggested in argument that the grade separation ordinance is void, because in conflict with the Public Service Commission Act of 1911 (Laws Wash. 1911, c. 117). That question is now pending before the Supreme Court of the state, and I will not discuss it, as I do not deem it of vital importance here. I might suggest, however, that a change in railroad grades through a city will often unavoidably necessitate a change in the grades of the streets as well, and to confer jurisdiction upon a state board over the one would in a measure confer jurisdiction over the other; and to confer jurisdiction upon a state board over the streets of a city would be so far inconsistent with our preconceived notions of local self-government that the statute should not be given that construction, if any other construction is permissible.

To discuss the questions of evidence presented in argument, or to attempt a further review of the authorities cited, would extend this opinion to an inordinate length, with no corresponding benefits. I will only add in conclusion that, after a full and painstaking consideration of the case, I am convinced that the bills are without substantial equity, and they are accordingly dismissed.