[No. 9771.  *En Banc.*  October 7, 1913.]

NORTHERN PACIFIC RAILWAY COMPANY, *Appellant*, v.
P. J. CONCANNON *et al.*, *Respondents.*

NORTHERN PACIFIC RAILWAY COMPANY, *Appellant*, v.
R. SHADE *et al.*, *Respondents.*

NORTHERN PACIFIC RAILWAY COMPANY, *Appellant*, v.
MARY CLASSEN, *Respondent.*[1]

ADVERSE POSSESSION—RAILROAD RIGHT OF WAY—COLOR OF TITLE—
WHAT CONSTITUTES—EVIDENCE—SUFFICIENCY. Adverse possession of
part of .the Northern Pacific Railway right of way, outside of the
100-foot limit, is not insufficient to confer title, as being that of a
mere squatter, where the claimant entered under deeds from parties
previously in possession, he was deterred from getting an abstract
by the heavy expense involved, his possession was at all times hostile
to the true owner, his improvements possessed the character of a
permanent home of the value of $1,500 to $2,000, and the company,
although having knowledge of his possession and improvements, did
nothing to disturb his possession or assert ownership to the land.

ADVERSE POSSESSION—TACKING—PRIVITY—EVIDENCE—SUFFICIENCY.
Where there is privity of interest, the adverse possession of succes-
sive owners may be tacked, notwithstanding evidence of their deeds
was unsatisfactory and they were not recorded, where other cir-
cumstances and conditions were sufficient to sustain a claim of
right under color of title.

ADVERSE POSSESSION — RAILROADS — RIGHT OF WAY — POWER TO
ALIENATE—REMOVAL OF RESTRICTIONS—STATUTES—CONSTRUCTION. Con-
gress having, in 1864, granted a four hundred foot right of way to
the Northern Pacific Railroad, alienation of which was prevented
by the policy of the government, the act of Congress of April 28,
1904, 33 Stat. at L. 538, legalizing and confirming all conveyances
by the company "heretofore" made of any part of the right of way
more than 100 feet from the center line, in case the company files
with the secretary of the interior its written acceptance of the
terms and provisions of the act, is remedial, and viewed in the
light of its history, and the construction of the Federal supreme
court, extending its operation to acquisitions by adverse possession,
was intended to waive the governmental policy and the reversion-
ary interest of the public in such portions of the right of way,
thereby permitting conveyances thereof subsequent as well as prior

[1]Reported in 135 Pac. 652.                    .  ˙

to the act; hence the act was prospective and authorizes the ac-
quisition of title by adverse possession subsequent to its passage.

ADVERSE POSSESSION—COLOR OF TITLE—SETTLEMENT ON RAILROAD
RIGHT OF WAY. Adverse possession of portions of the Northern Pa-
cific right of way outside of the 100-foot limit, which Congress had
authorized the railroad company to alienate, with the erection of
valuable improvements, ripens into a title, where the occupancy
was adverse for the period of more than ten years, without objec-
tion by the company, although the predecessor in interest claimed
under an original settlement made under the belief that the land
was open to settlement and which failed to initiate a title.

PUBLIC LANDS—GRANTS—RAILROAD RIGHT OF WAY—AUTHORITY TO
ALIENATE—REVERSION. Act of Congress, 33 Stat. at L. 538, legaliz-
ing and confirming all conveyances made by the company of land
forming part of the Northern Pacific right of way outside of the
100-foot limit, was not intended to work an abandonment or for-
feiture of any part of the right of way, or to cause the same to re-
vert to the government.

SAME—STATUTES—CONSTRUCTION. The construction of an act of
Congress authorizing a particular railroad company to alienate a
portion of its right of way is not affected by the fact that it does
not apply to all land grants, nor by the motive of Congress.

Appeals from judgments of the superior court for Pierce
county, Card, J., entered March 22, 1911, in favor of the de-
fendants, dismissing consolidated actions in ejectment. Af-
firmed.

*Geo. T. Reid, J. W. Quick,* and *L. B. da Ponte,* for appel-
lant.

*Huffer, Hayden & Hamilton,* for respondents Concannon
*et al.*

*Gordon, Easterday & Askren,* for respondents Shade.

CHADWICK, J.—As will be seen by reference to the title,
several cases, involving adverse claims to a part of the origi-
nal grant of a right of way to the Northern Pacific Railroad
Company, now Northern Pacific Railway Company, have been
consolidated. Judgments were entered in the court below
holding title to be in the claimants, and the company has ap-
pealed.

The case of Concannon will be first considered. By the terms of the act of July 2, 1864, the Northern Pacific Railroad Company was granted a right of way of 200 feet on either side of its main line to be thereafter definitely located. In *Northern Pac. R. Co. v. Townsend*, 190 U. S. 267, it was held that no part of the right of way as originally granted could be acquired under a state statute of limitations, inasmuch as the grant had been made for a distinct purpose carrying an obligation to the United States government, and could not therefore be voluntarily alienated; that to so allow, would permit that to be done indirectly which could not be done directly.

It seems that the railway company had conveyed parts of its rights of way, and, following the decision in the *Townsend* case, the passage of an act was procured legalizing all such conveyances. This act and its effect engaged the attention of the court in *Northern Pac. R. Co. v. Ely*, 197 U. S. 1, and it was there held that the act of 1904 operated to confirm titles acquired within the 200-foot but without the 100-foot limit, by adverse possession, as well as those acquired by deed.

The land claimed by Concannon lies without the 100-foot limit. His possession comes through one Smith, who settled on the premises in 1885. Smith sold to one Girard in 1892. So far as the record shows, Smith may have been a squatter. His possession is unexplained. Girard fenced the land and made some improvements thereon. Girard remained in exclusive possession of the premises until 1898, when he sold to Concannon, who has added to the improvements so that they now possess the character of a permanent home and are of the value of from $1,500 to $2,000, as estimated by the witnesses. Girard testifies that he received a deed from Smith, and that he gave this deed and his own to Concannon. Concannon swears that he received a deed. None of these instruments were recorded, and according to the testimony of Concannon, they are now lost.

Although neither of these witnesses can remember who

made out the deeds, they agree in a general way as to the description of them, and both say that the recited description of the land was such as to include the disputed tract. Both insist that it was their intention to claim the land as against the world, and Concannon says he tried to get an abstract, but was put off by the abstracter, who told him that it involved more than 150 instruments and would be too expensive. He also swears that he offered to pay taxes, but was refused the privilege because the land had not been listed.

It is the contention of the appellant that the occupants of the land had been mere squatters and, under the rule of *Blake v. Shriver*, 27 Wash. 593, 68 Pac. 330, and *Northern Pac. R. Co. v. Devine*, 53 Wash. 241, 101 Pac. 841, had no interest which they can assert against the company. But we think that the case made by Concannon takes it out of the rule of these cases. His holding was at all times hostile to the true owner. The character of his improvements was such as to challenge appellant's interest, and at all times appellant had notice and knowledge of the occupancy, as well as the character of the possession and improvements. But relying upon the rule of law as announced in the *Townsend* case, appellant did nothing although admitting, through its general western land agent, who was a witness in its behalf, that from time to time it made investigations and noted the improvements; but it did nothing to disturb the occupants because it felt secure in its title. Neither did it serve any notice upon Girard or Concannon that would indicate an intention to assert ownership in the premises occupied. In the *Shriver* case, the improvements were of such character as to indicate a strolling, straggling occupancy, and were clearly insufficient to constitute a notice of adverse possession. The same principle was applied in the *Devine* case, where the improvements were of such character as to indicate that the occupant had no faith in his possession and no intention to hold other than by permission of the true owner.

It is insisted, however, that the possession of Concannon,

which dates from 1898, cannot be tacked to that of Girard, and, without it, his title cannot be sustained. The rule, as we understand it to be, is that, where there is a privity of interest, such possession can be tacked. We grant that the evidence of the deeds from Smith to Girard and from Girard to Concannon is unsatisfactory, and without the aid of the other circumstances and conditions which we have noticed, would hardly be sufficient to sustain a claim of right or show color of title. But, as we view the law, Concannon has to his own credit a possession of ten years which has been admittedly hostile to the appellant.

Appellant assumes that the act of 1904 is confirmatory only of conveyances that had been theretofore made or titles that were complete by adverse possession on April 28, 1904, the date of its passage. The act, which is remedial, reads as follows:

"That all conveyances heretofore made by the Northern Pacific Railroad Company or by the Northern Pacific Railway Company, of land forming a part of the right of way of the Northern Pacific Railroad, granted by the Government by any act of Congress, are hereby legalized, validated, and confirmed: Provided, That no such conveyance shall have effect to diminish said right of way to a less width than one hundred feet on each side of the center of the main track of the railroad as now established and maintained.

"Sec. 2. That this act shall have no validating force until the Northern Pacific Railway Company shall file with the Secretary of the Interior an instrument in writing, accepting its terms and provisions." 33 Stat. at L. 538.

This act, if standing alone, might be susceptible of such construction, but when viewed in the light of its history, congress must have intended to grant a right to the company to make conveyance in the future as well as to confirm those made in the past. In the Townsend case, the court said:

"Manifestly, the land forming the right of way was not granted with the intent that it might be absolutely disposed of at the volition of the company. On the contrary, the

grant was explicitly stated to be for a designated purpose, one which negated the existence of the power to voluntarily alienate the right of way or any portion thereof. The substantial consideration inducing the grant was the perpetual use of the land for the legitimate purposes of the railroad, just as though the land had been conveyed in terms to have and to hold the same so long as it was used for the railroad right of way. In effect the grant was a limited fee, made on an implied condition of reverter in the event that the company ceased to use or retain the land for the purpose for which it was granted. This being the nature of the title to the land granted for the special purpose named, it is evident that to give such efficacy to a statute of limitations of a state as would operate to confer a permanent right of possession to any portion thereof upon an individual for his private use, would be to allow that to be done by indirection which could not be done directly, for, as said in *Grand Trunk Railroad v. Richardson*, 91 U. S. 454, 468, 'a railroad company is not at liberty to alienate any part of its roadway so as to interfere with the full exercise of the franchise granted.' Nor can it be rightfully contended that the portion of the right of way appropriated was not necessary for the execution of the powers conferred by Congress, for, as said in *Northern Pacific Railroad Co. v. Smith*, 171 U. S. 261, 275, speaking of the very grant under consideration: 'By granting a right of way four hundred feet in width, Congress must be understood to have conclusively determined that a strip of that width was necessary for a public work of such importance.' Neither courts nor juries, therefore, nor the general public, may be permitted to conjecture that a portion of such right of way is no longer needed for the use of the railroad and title to it has vested in whomsoever chooses to occupy the same. The whole of the granted right of way must be presumed to be necessary for the purposes of the railroad, as against a claim by an individual of an exclusive right of possession for private purposes. To repeat, the right of way was given in order that the obligations to the United States assumed in the acceptance of the act might be performed. Congress having plainly manifested its intention that the title to and possession of the right of way should continue in the original grantee, its successors and assigns, so long as the railroad was maintained, the possession by in-

dividuals of portions of the right of way cannot be treated without overthrowing the act of Congress as forming the basis of an adverse possession which may ripen into a title good as against the railroad company."

It will thus be seen that the court held that the right of way had been granted for a specific purpose in which the public had an interest; and that, because of the interest of the public, it could not be invaded or taken away by adverse possession. The act of April 28, 1904, is a waiver of that policy, as plainly as if it had been stated in terms. Else, why the proviso that no such conveyance shall have the effect to diminish the right of way to a width less than 100 feet on each side of the center line of the railroad as now established and maintained? It was at once a recognition of what the company had been doing, and a license to reduce, by sale or otherwise, its right of way to 200 feet. The Congress of the United States could have no possible interest in the individuals who had purchased a part of the right of way. Its only concern was in compelling the retention of so much of the granted right of way as it deemed to be necessary for the purposes of the railroad, and to carry out the spirit and intent of the original granting act. To say that it was the intent of the statute to relieve only certain undisclosed grantees, would do violence to the spirit of the act. Furthermore, if the act be construed according to its letter, it would only operate upon deeds and contracts, and by no process of reasoning could it be held to apply to titles by adverse possession. It is only upon the theory that the history of the act as well as the circumstances calling for its passage indicate a change of policy on the part of the United States government and an intent to permit voluntary disposition of the excess of the right of way, that the decision in the *Ely* case can be sustained. The question is not, however, expressly decided but rather reserved in the *Ely* case, the court saying:

"The act of April 28, 1904, in view of our decision in that case [the *Townsend* case], was obviously intended to and did have the effect to narrow the right of way to 200 feet in width, so far at least as outside of that strip the original right of way had been parted with."

It being a question of governmental policy and that alone, the conclusion is none the less manifest that the obvious intent of the statute was to waive the interest of the public in the strip outside of the original right of way. The act is remedial rather than curative, and falls within the rule that remedial statutes will be given prospective force unless the language employed conclusively negatives that construction. We are unwilling to believe that the employment of the word "heretofore" is sufficient to overcome the spirit of the act as gathered from the mischief sought to be cured, the circumstances calling for its passage, and the policy of the government as announced by the supreme court in the *Townsend* case. Public policy favors alienation of lands, and we will not presume that Congress found particular reasons to confirm a few conveyances, and at the same time assumed that the company had made all the conveyances it ever would make, or find necessary to make.

Appellant insists upon a strict construction of the act and especially of the word "heretofore;" saying that, if our version of the law be accepted, that word would be entirely eliminated from the statute; that the act does not provide that *all* conveyances are validated and confirmed, but operates only on an acceptance of its terms by the railway company. However forceful this argument may be, it is without merit in the light of the subject-matter of the act, the object sought to be accomplished and the decision of the supreme court of the United States in the·*Ely* case. As heretofore suggested, that case cannot be sustained upon any theory other than the one we have adopted. A strict construction of the act would entirely destroy the reasoning employed by the court to sustain its judgment. It is true that words of

common usage should be given their ordinary meaning. This
rule is not violated by our holding that the act of April
28, 1904, has prospective force. We have said that the *Ely*
case could not have been decided as it was if the act is given
a strict construction. The *Ely* case involved a title acquired
by adverse possession. Such a title is not included within the
literal words "all *conveyances* heretofore made." The whole
act is drawn either upon the theory that it operates only
upon conveyances, *i. e.* express contracts of the company, or
upon the theory of waiver of interest on the part of the gov-
ernment in the right of way, as asserted in the act and
affirmed in the *Townsend* case, so long as the act or inaction
(the *Ely* case) of the company does not operate "to diminish
the right of way to a less width than one hundred feet on
each side of the center of the main track of the railroad as
now established and maintained."

Again, if the act be held to operate only upon prior *con-
veyances*, how could the acceptance of "the terms and pro-
visions" of the act benefit one holding under a hostile and ad-
verse possession. In the *Townsend* case, it is said that a
title could not be acquired in the right of way by prescrip-
tion or otherwise, because of the government's interest. In
the *Ely* case, the same court having the act now before us to
consider, has said that such a title can be sustained, because
the act was obviously intended to permit the narrowing of
the right of way to two hundred feet. The same arguments
were made in the *Ely* case as are now advanced, that is, that
the act was plain and would not bear construction. In the
light of that case, the question to be answered is not difficult;
if the act was retrospective and referred only, as is now con-
tended, to certain *conveyances* theretofore made, the *Ely* case
could not have been decided as it was, for it will not be con-
tended that an adverse title could be set up to any part of the
right of way in which the government had an interest. Such
titles do not obtain against the government. Only by treat-

ing the outer 100 feet as the property of the company, in which the government had no interest, can Ely's title be called good. The act of April 28, 1904, made no reference, either by apt words or fair implication to such titles, yet the court said:

"So far as title to portions of the right of way could be lawfully acquired from the railway company, defendants below, appellees in the supreme court, had acquired title to their parcels by adverse possession, and occupied the same position as if they had received conveyances, which the act of April 28, 1904, operated to confirm. The act is remedial and to be construed accordingly."

The case was decided upon the theory that the government had waived its interest. If that theory be unsound, it should be corrected by the supreme court of the United States and not by us. That court may say that it has not so decided, or that we have misread its opinion, or that it did so decide and upon further consideration has concluded that it was in error; but an inferior court cannot so discriminate, it must take the law as it is at present written.

The point is made that the act of 1904 operates only on titles by prescription or by adverse possession where the period of limitation had run. The quotation last made is relied on to sustain this contention. There is nothing in the act that says this is so, nor do we think the supreme court of the United States has so held.

There seems to be a dearth of authority subject to concrete application to the case at bar. In construing a similar law, the supreme court in *McFaddin v. Evans-Snider-Buel Co.*, 185 U. S. 505, held the words "heretofore" and "hereby validated" evidenced an intent that the act should be applied to matters occurring before the passage of the act. The prospective force of the statute was not passed on. The court was considering a statute involving private right. In our judgment there is a distinction between acts applying to private rights or contracts and an act which by its terms

waives the interest of the public.   Neither do we conceive the
act to be special in its terms.   It applies to all deeds and con-
tracts as plainly as if it had been said, "The United States
waives its interest in the outer 100 feet of the right of way
of the Northern Pacific Railroad company, confirms all grants
heretofore made, and to be hereafter made, provided that no
conveyance shall now or hereafter be held to convey any part
of the 100-foot strip on either side of the main line."   This
view of the statute compels an affirmance of the Concannon
case.

Shade and Classen claim under an original settlement by
one Wright.   Wright settled believing the land subject to
homestead and would, under the decision in *McNaught-
Collins Imp. Co. v. May,* 52 Wash. 632, 101 Pac. 237, be
held to have failed to initiate a title.   His successors have,
however, erected valuable improvements.   Shade's settle-
ment dates from March, 1895, and Classen's from the year
1897.   Their occupancy we find to be adverse and their cases
fall within the rule governing the Concannon case, and en-
titles them to an affirmance of the judgment.

Finally, it is contended that, if we hold as we have, it will be
to find in legal effect that an abandonment or forfeiture has
been worked by the act of 1904, and that the land would re-
vert to the government and would not be subject to private
ownership, under the authority of the *United States v.
Southern Pac. R. Co.,* 146 U. S. 570, and the *United States
v. Northern Pac. R. Co.,* 177 U. S. 435.

We find nothing in the act to warrant us in holding that
Congress intended to find that any part of the right of way
was abandoned or forfeited.   The scope of the act is plain;
that is, to permit the company to pass title to a part of its
right of way, by deed or by the process of limitation.   The
authorities cited have no bearing on the instant case.

Neither is there merit in the suggestion that, if Congress
had intended to legislate as we have found that intent to be,

it would have made the act apply to all land grant companies. The Congress might have legislated for all, but it did not. Its motive is of no concern to the courts.

Judgments affirmed.

CROW, C. J., PARKER, GOSE, ELLIS, MAIN, and MORRIS, JJ., concur.