# NORTHERN PACIFIC RAILWAY COMPANY *v.*
# TOWNSEND.

### ERROR TO THE SUPREME COURT OF THE STATE OF MINNESOTA.

#### No. 160.  Submitted January 30, 1903.—Decided May 4, 1903.

Where the United States grants a right of way by statute to a railroad company which files a map of definite location, and the road is constructed, the land forming the right of way is taken out of the category of public land subject to preëmption and sale, and the land department is without authority to convey rights therein.  Homesteaders filing entries thereafter can acquire no interest in land within the right of way on the ground that the grants to them were of full legal subdivisions the descriptions whereof include part of the right of way.

Although a right of way granted by the United States through public domain within a State may be amenable to the police power of that State, an individual cannot for private purposes acquire by adverse possession under a statute of limitations of that State any portion of a right of way granted by the United States to a railroad company in the manner and under the conditions as the right of way was granted to the Northern Pacific Railroad Company.

THIS controversy concerns the validity of an asserted title, by adverse possession, to a portion of the right of way in Wadena County, Minnesota, granted to the Northern Pacific Railroad Company, its successors and assigns, by the second section of the act of Congress, approved July 2, 1864.  13 Stat. 365.  The plaintiff in error, the Northern Pacific Railway Company, a corporation of the State of Wisconsin, acquired the railroad and property of the former named company on or about August 31, 1896, by purchase at a sale under foreclosure of certain mortgages.

By the first section of the act of 1864, the Northern Pacific Railroad Company was created a corporation, and was empowered to construct and maintain a continuous railroad and telegraph line from a point on Lake Superior to some point on Puget Sound.  In the second section of the act it was provided, among other things, as follows :

" *And be it further enacted,* That the right of way through the public lands be, and the same is hereby, granted to said Northern Pacific Railroad Company, its successors and assigns, for the construction of a railroad and telegraph as proposed; and the right, power, and authority is hereby given to said corporation to take from the public lands, adjacent to the line of said road, material of earth, stone, timber, and so forth, for the construction thereof. Said way is granted to said railroad to the extent of two hundred feet in width on each side of said railroad where it may pass through the public domain, including all necessary ground for station buildings, workshops, depots, machine shops, switches, side tracks, turntables and water stations; and the right of way shall be exempt from taxation within the Territories of the United States. . . ."

Section 3 created a large land grant to secure the construction and continuous maintenance of the road. Construction was to be supervised by commissioners appointed by the President. (Sec. 4.) Section 5 provided how the road must be built, and that the company should not charge the government higher rates than individuals. The right of eminent domain was conferred by section 7. In section 8 conditions of the grant in respect to the commencement and completion of the construction of the road were enumerated. Section 9 reserved the right to Congress to complete the road. Section 10 secured to all the people of the United States the right to subscribe for its stock. Section 11 made it a post road subject to the use of the United States for government service, and subject to such regulations as Congress might impose respecting charges for government transportation. The remaining provisions of the act dealt with the mode of acceptance of the grant, the powers and duties of the board of directors and other officers of the company, the payments of cash assessments and other subjects. We need only further particularly refer, however, to section 18, wherein it was provided that the railroad company, previous to commencing the construction of its road, should obtain the consent of the legislature of any State through which any portion of its line might pass. Such consent was duly given by the State of Minnesota.

The company signified its acceptance in writing, as provided in the act. In November, 1871, the line of road was definitely located and a duly approved map was filed showing said definite location. This line crossed the northwest quarter of section 24, township 134 north, of range 35, west of the fifth principal meridian, Minnesota. At that time, as well as prior thereto, said quarter section was public land, to which the United States had full title, and the same was not reserved or otherwise appropriated, nor had any entries or filings or applications to make entry or filing thereon been made. During the years 1870 and 1871 the railroad was duly constructed through the section referred to, and the portion of the road thus constructed was thereafter duly accepted by the President.

In December, 1878, and February, 1882, homestead entries were initiated on said northwest quarter of section 24, and on November 30, 1885, and July 24, 1889, patents, which purported to convey the whole of each forty-acre subdivision, were issued to Abner Townsend and George H. Brown, respectively. Subsequently, in 1886 and 1888, the title to said northwest quarter was conveyed to the defendant in error, Minerva Townsend. During the occupancy of the homesteaders they cultivated up to the line of the ordinary and snow fences of the railroad, situated respectively fifty and one hundred feet from the center of the track, and, such occupancy continued a sufficient length of time to constitute a title by adverse possession under the limitation statutes of Minnesota. Demand was made by the railroad company for possession of that portion of the quarter section which was within the granted right of way, and upon non-compliance an action of ejectment was brought in a court of the State of Minnesota to recover possession of the disputed ground. The case was tried by the court without a jury. Lengthy findings of fact were made, and as a conclusion of law the court found that the railroad company was entitled to the possession of the premises described, and entered judgment accordingly.

On appeal, the Supreme Court of Minnesota reversed the judgment of the trial court. 84 Minnesota, 152. The cause was then brought to this court.

*Mr. C. W. Bunn* and *Mr. James B. Kerr* for plaintiff in error.

*Mr. A. G. Broker, Mr. F. F. Post* and *Mr. Harold Preston* for defendant in error.

MR. JUSTICE WHITE, after making the foregoing statement, delivered the opinion of the court.

At the outset, we premise that, as the grant of the right of way, the filing of the map of definite location, and the construction of the railroad within the quarter section in question preceded the filing of the homestead entries on such section, the land forming the right of way therein was taken out of the category of public lands subject to preëmption and sale, and the land department was therefore without authority to convey rights therein. It follows that the homesteaders acquired no interest in the land within the right of way because of the fact that the grant to them was of the full legal subdivisions.

Conceding the adverse possession and its efficacy under the state law as against the railroad right of way, to be as found by the state court, the sole question which arises then for decision is whether, in view of the provisions of the act of Congress to which we have referred, an asserted title by adverse possession can be made efficacious as respects the property in controversy. And depending, as this question does, upon the nature and effect of the acts of Congress, its solution necessarily involves a Federal question.

In determining whether an individual, for private purposes may, by adverse possession, under a state statute of limitations, acquire title to a portion of the right of way granted by the United States for the use of this railroad, we must be guided by the doctrine enunciated in *Packer* v. *Bird*, 137 U. S. 661, 669, and approvingly referred to in *Shively* v. *Bowlby*, 152 U. S. 1, 44, viz.: "The courts of the United States will construe the grants of the general government without reference to the rules of construction adopted by the States for their grants; but whatever incidents or rights attach to the owner-

ship of property conveyed by the government will be determined by the States, subject to the condition that their rules do not impair the efficacy of the grants or the use and enjoyment of the property by the grantee." Following decisions of this court construing grants of rights of way similar in tenor to the grant now being considered, *New Mexico* v. *United States Trust Co.,* 172 U. S. 171, 181; *St. Joseph & Denver City R. R. Co.* v. *Baldwin,* 103 U. S. 426, it must be held that the fee passed by the grant made in section 2 of the act of July 2, 1864. But, although there was a present grant, it was yet subject to conditions expressly stated in the act, and also (to quote the language of the *Baldwin* case) "to those necessarily implied, such as that the road shall be . . . used for the purposes designed." Manifestly, the land forming the right of way was not granted with the intent that it might be absolutely disposed of at the volition of the company. On the contrary, the grant was explicitly stated to be for a designated purpose, one which negated the existence of the power to voluntarily alienate the right of way or any portion thereof. The substantial consideration inducing the grant was the perpetual use of the land for the legitimate purposes of the railroad, just as though the land had been conveyed in terms to have and to hold the same so long as it was used for the railroad right of way. In effect the grant was of a limited fee, made on an implied condition of reverter in the event that the company ceased to use or retain the land for the purpose for which it was granted. This being the nature of the title to the land granted for the special purpose named, it is evident that to give such efficacy to a statute of limitations of a State as would operate to confer a permanent right of possession to any portion thereof upon an individual for his private use, would be to allow that to be done by indirection which could not be done directly, for, as said in *Grand Trunk Railroad* v. *Richardson,* 91 U. S. 454, 468, "a railroad company is not at liberty to alienate any part of its roadway so as to interfere with the full exercise of the franchises granted." Nor can it be rightfully contended that the portion of the right of way appropriated was not necessary for the execution of the powers con-

ferred by Congress, for, as said in *Northern Pacific Railroad Co.* v. *Smith*, 171 U. S. 261, 275, speaking of the very grant under consideration : " By granting a right of way four hundred feet in width, Congress must be understood to have conclusively determined that a strip of that width was necessary for a public work of such importance." Neither courts nor juries, therefore, nor the general public, may be permitted to conjecture that a portion of such right of way is no longer needed for the use of the railroad and title to it has vested in whomsoever chooses to occupy the same. The whole of the granted right of way must be presumed to be necessary for the purposes of the railroad, as against a claim by an individual of an exclusive right of possession for private purposes.

To repeat, the right of way was given in order that the obligations to the United States assumed in the acceptance of the act might be performed. Congress having plainly manifested its intention that the title to and possession of the right of way should continue in the original grantee, its successors and assigns, so long as the railroad was maintained, the possession by individuals of portions of the right of way cannot be treated without overthrowing the act of Congress as forming the basis of an adverse possession which may ripen into a title good as against the railroad company.

Of course, nothing that has been said in anywise imports that a right of way granted through the public domain within a State is not amenable to the police power of the State. Congress must have assumed when making this grant, for instance, that in the natural order of events, as settlements were made along the line of the railroad, crossings of the right of way would become necessary, and that other limitations in favor of the general public upon an exclusive right of occupancy by the railroad of its right of way might be justly imposed. But such limitations are in no sense analogous to claim of adverse ownership for private use.

As our construction of the act of Congress determines the question presented for decision, it becomes unnecessary to review the cases which have been called to our attention supporting on the one hand or denying on the other the broad conten-

tion that title by adverse possession, under state statutes of limitation, may be acquired by individuals to land within the right of way of a railroad. None of the cases adverted to as holding the affirmative of the proposition even suggest that the rule would be applicable where its enforcement would conflict with the powers and duties imposed by law on a railroad corporation in a given case. As here we find that the nature of the duties imposed by Congress upon the railroad company and the character of the title conferred by Congress in giving the right of way through the public domain are inconsistent with the power in an individual to acquire, for private purposes, by limitation, a portion of the right of way granted by Congress, the cases in question are inapposite.

The judgment of the Supreme Court of Minnesota must be *Reversed, and the case remanded to that court for further proceedings not inconsistent with this opinion.*

Mr. Justice Harlan and Mr. Justice Brown dissent.