Argued and submitted February 24, affirmed August 12, 2009

Terry WOLF
and Florence Wolf,
*Plaintiffs-Appellants,*

*v.*

CENTRAL OREGON & PACIFIC RAILROAD, INC.,
a Delaware corporation,
*Defendant-Respondent.*

Douglas County Circuit Court
05CV4330CC; A136347

216 P3d 316

Charles F. Lee argued the cause for appellants. With him on the briefs was Lee & Kaser, P.C.

Daniel Webb Howard argued the cause for respondent. With him on the brief was Gleaves Swearingen LLP.

Before Edmonds, Presiding Judge, and Wollheim, Judge, and Sercombe, Judge.

EDMONDS, P. J.

## EDMONDS, P. J.

Plaintiffs appeal following the trial court's entry of summary judgment in favor of defendant. Plaintiffs, who are owners of real property in Douglas County, Oregon (the Wolf property), brought this action against defendant, claiming a prescriptive easement that would allow them to continue to use the private crossing over defendant's railroad tracks that intersect their land. They also sought damages they alleged had resulted from defendant's removal of the paved surface of the existing private crossing. The trial court granted summary judgment in defendant's favor based on its conclusions that plaintiffs could not obtain a prescriptive easement over a government granted railroad right-of-way and that the railroad, in this case, obtained its right-of-way before plaintiffs' predecessor-in-interest filed his claim to the land at issue. On appeal, plaintiffs assert that the trial court erred in determining that (1) a prescriptive easement could not lie over property granted by the federal government as railroad right-of-way; and (2) the land in question had been granted to the railroad by the federal government. We affirm.

The relevant facts on summary judgment are not in dispute. The Wolf property is bisected by defendant's railroad tracks that were originally authorized by the United States Congress pursuant to a land grant enacted on July 25, 1866 (the 1866 land grant).[1] The 1866 land grant provided for a right-of-way 200 feet wide over the public lands.[2] In 1880,

---

[1] Defendant is the successor-in-interest to the railroad company that was originally granted the right-of-way.

[2] The 1866 land grant, entitled "An Act granting Lands to aid in Construction of a Railroad and Telegraph Line from the Central Pacific Railroad, in California, to Portland, Oregon," provides, in part:

"SEC. 3. *And be it further enacted*, That the right of way through the public lands be, and the same is hereby, granted to said companies for the construction of said railroad and telegraph line; and the right, power, and authority are hereby given to said companies to take from the public lands adjacent to the line of said road, earth, stone, timber, water, and other materials for the construction thereof. Said right of way is granted to said railroad to the extent of one hundred feet in width on each side of said railroad where it may pass over the public lands, including all necessary grounds for stations, buildings, workshops, depots, machine-shops, switches, side-tracks, turn-tables, water stations, or any other structures required in the construction and operating of said road."

Ch 262, § 3, 14 Stat 239, 240 (1866).

before the land was surveyed, plaintiffs' predecessor-in-interest, Anderson, settled on the Wolf property and constructed a house, barn, and outbuildings. The public survey of the land was filed in June 1882. On August 24, 1882, the railroad filed a definite line location survey with the Secretary of the Interior. The definite line location plotted the course of the tracks over the Wolf property. Thereafter, on September 8, 1882, Anderson filed a preemption claim on the Wolf property with the United States Land Office.[3] On

---

[3] The Homestead Act of 1862, pursuant to which settlers could file preemption claims to obtain ownership of public property, provided, in part:

"[A]ny person who is the head of a family, or who has arrived at the age of twenty-one years, and is a citizen of the United States, or who shall have filed his declaration of intention to become such, as required by the naturalization laws of the United States, and who has never borne arms against the United States Government or given aid and comfort to its enemies, shall, from and after the first January, eighteen hundred and sixty-three, be entitled to enter one quarter section or a less quantity of unappropriated public lands, upon which said person may have filed a preemption claim, or which may, at the time application is made, be subject to preemption at one dollar and twenty-five cents, or less, per acre; or eighty acres or less of such unappropriated lands, at two dollars and fifty cents per acre, to be located in a body, in conformity to the legal subdivisions of the public lands, and after the same shall have been surveyed: *Provided*, That any person owning land and residing on land may, under the provisions of this act, enter other land lying contiguous to his or her said land, which shall not, with the land so already owned and occupied, exceed in the aggregate one hundred and sixty acres.

"SEC. 2. *And be it further enacted*, That the person applying for the benefit of this act shall, upon application to the register of the land office which he or she is about to make such entry, make affidavit before the said register or receiver that he or she is the head of a family, or is twenty-one years or more of age, or shall have performed service in the army or navy of the United States, and that he has never borne arms against the Government of the United States or given aid and comfort to its enemies, and that such application is made for his or her exclusive use and benefit, and that said entry is made for the purpose of actual settlement and cultivation, and not either directly or indirectly for the use or benefit of any other person or persons whomsoever; and upon filing the said affidavit with the register or receiver, and on payment of ten dollars, he or she shall thereupon be permitted to enter the quantity of land specified: *Provided, however*, That no certificate shall be given or patent issued therefor until the expiration of five years from the date of such entry; and if, at the expiration of such time, or at any time within two years thereafter, the person making such entry * * * shall prove by two credible witnesses that he, she, or they have resided upon or cultivated the same for the term of five years immediately succeeding the filing of the affidavit aforesaid, and shall make affidavit that no part of said land has been alienated, and that he has borne true allegiance to the Government of the United States; then, in such case, he, she, or they, if at that time a citizen of the United States, shall be entitled to a patent, as in other cases provided for by law[.]"

Ch 75, §§ 1-2, 12 Stat 392 (1862), *repealed by* Pub L 94-579 § 701, 90 Stat 2744 (1976).

February 2, 1883, after the filing of the definite line location, Anderson deeded the railroad a 100-foot wide right-of-way over the Wolf property. Anderson paid the federal government $200 for the land on December 7, 1883, and he received a patent to the land from the federal government in 1887. The railroad tracks were completed over the Wolf property by 1884.

Plaintiffs' home and a portion of their land sit north of the tracks; an additional 14 acres of their land is located on the south side of the tracks. Plaintiffs access the south part of the property by using a private grade crossing over the railroad tracks; plaintiffs and their predecessors-in-interest have used the crossing for many years. In August 2005, defendant removed the paved grade crossing that plaintiffs had been using to cross the tracks and replaced it with gravel. Defendant also required that plaintiffs enter into a license agreement to continue using the crossing. That ultimately led plaintiffs to file this action claiming a prescriptive right to cross the tracks and seeking damages resulting from defendant's removal of the black top.

Defendant filed multiple motions for summary judgment, and the trial court ultimately granted summary judgment in defendant's favor. It stated:

"I have previously ruled and continue to rule that the law is government grant railroad property that is right of way cannot be adversely possessed or subject to a prescriptive easement.

"And the reason for that is that the government grant property was given for railroad right of way only, and if for some reason the railroad does not use it for that purpose the act itself or it weren't able to mature it into the railroad's

---

The Homestead Act of 1862 further provided,

"[t]hat nothing in this act shall be so construed as to prevent any person who has availed him or herself of the benefits of the first section of this act, from paying the minimum price, or the price to which the same may have graduated, for the quantity of land so entered at any time before the expiration of the five years, and obtaining a patent therefor from the government, as in other cases provided by law, on making proof of settlement and cultivation as provided by existing laws granting preemption rights."

Ch 75, § 8, 12 Stat 392, 393.

use the—the property was to revert back to the government."

The court continued:

"As we had traversed in our last argument, what I was unsure about is whether or not the preemption right that was filed and perfected I think is the word we'd use now on September eighth, 1882, by Mr. Anderson related back to his possession in October of 1880.

"And I think the law is clear that if this were a dispute between two private individuals, not involving a government grant of railroad, Mr. Anderson would prevail because the—the preemptive right, when filed on September eighth, 1882, does relate back and the homestead—and a homestead right indeed would relate back to October of 1880, namely, the possession.

"However, not unlike a lot of things in life, as between individuals the law is one thing. As between an individual and a—and the government the law is another thing. And up until the time that the Anderson right is preemptive or homestead is perfected, which it was on 8 September, 1882, up until that time the law is that the government * * * can deed that property to someone else, and they did, in fact, in this case to the railroad, and the railroad's title vested when the line was identified and plotted and that's not later than the 24th of August, 1882."

The court concluded that, under the law and the undisputed facts of the case, the railroad's claim vested first in time and, therefore, plaintiffs could not establish a right to use the railroad crossing.

On appeal, plaintiffs assert that the trial court incorrectly concluded that a prescriptive easement cannot be established, as a matter of law, over federally granted railroad right-of-way. They further argue that the railroad's right-of-way over the Wolf property was not part of the federal grant. In support of that portion of their assignment of error, plaintiffs raise three issues, two of which were not raised before the trial court. Specifically, plaintiffs assert for the first time on appeal that (1) the Wolf property was school land and was "no longer part of the public lands of the federal government on August 24, 1882, because any interest that the federal government had in that land had passed to the

state of Oregon no later than the date the government survey was filed" and (2) there was a public road on the Wolf property that predated the definite line location map and "[t]o the extent the existing road gave the public rights as of August 24, 1882, the right-of-way grant would not have cut off those rights." Because neither of those issues was preserved before the trial court, we will not consider them on appeal. ORAP 5.45(1) ("No matter claimed as error will be considered on appeal unless the claimed error was preserved in the lower court * * *.").

Summary judgment is appropriate only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. ORCP 47 C. There is no genuine issue of material fact where, "based upon the record before the court viewed in a manner most favorable to the adverse party, no objectively reasonable juror could return a verdict for the adverse party on the matter that is the subject of the motion for summary judgment." *Id.*

We turn first to defendant's assertion that the trial court's judgment should be affirmed because the Interstate Commerce Commission Termination Act of 1995 (ICCTA) gives the Surface Transportation Board *"exclusive* jurisdiction to regulate rail crossing, [and] preempts [plaintiffs'] state-law claim asserting that they have a prescriptive right to a private vehicular crossing over" defendant's tracks. (Emphasis in original.) That issue relates to the ability of the court to grant an effective remedy under state law in this case and, accordingly, we address it at the outset. *See Derenco v. Benj. Franklin Fed. Sav. and Loan*, 281 Or 533, 537, 577 P2d 477 (1978) (addressing preemption first because resolution of that issue might "obviate all other problems, depending upon how it is decided"); *see also Anderson v. Evergreen International Airlines Inc.*, 131 Or App 726, 729, 886 P2d 1068 (1994), *rev den*, 320 Or 749 (1995) (addressing preemption first because it "implicates [the court's] jurisdiction").

■ ■ Pursuant to the Supremacy Clause of the United States Constitution, the laws of the United States are "the supreme Law of the Land; * * * any Thing in the Constitution or Laws of any state to the contrary notwithstanding." US Const, Art VI, cl 2. State laws that conflict with or are

expressly preempted by federal law are, thus, "without effect." *Cipollone v. Liggett Group, Inc.*, 505 US 504, 516, 112 S Ct 2608, 120 L Ed 2d 407 (1992) (internal quotation marks omitted). In evaluating whether a federal law preempts a state law, "the purpose of Congress is the ultimate touchstone[.]" *Id.* (brackets and internal quotation marks omitted). In statutes where Congress has included a provision specifically addressing preemption, areas of state law beyond the scope of that specific statutory provision are not preempted. *Id.*

■     The statutory provision at issue in this case, 49 USC § 10501(b), provides:

"(b)   The jurisdiction of the [Surface Transportation Board (STB)] over—

"(1)   transportation by rail carriers, and the remedies provided in this part with respect to rates, classifications, rules (including car service, interchange, and other operating rules), practices, routes, services, and facilities of such carriers; and

"(2)   the construction, acquisition, operation, abandonment, or discontinuance of spur, industrial, team, switching, or side tracks, or facilities, even if the tracks are located, or intended to be located, entirely in one State,

"is exclusive. Except as otherwise provided under this part, the remedies provided under this part with respect to regulation of rail transportation are exclusive and preempt the remedies provided under Federal or State law."

Thus, ICCTA explicitly preempts state law remedies with respect to "regulation of rail transportation." Both "transportation" and "railroad" are expressly defined in 49 USC § 10102, which provides:

"(6)   'railroad' includes—

"(A)   a bridge, car float, lighter, ferry, and intermodal equipment used by or in connection with the operation of a railroad;

"(B)   the road used by a rail carrier and owned by it or operated by it under an agreement; and

"(C)   a switch, spur, track, terminal, terminal facility, and a freight depot, yard, and ground, used or necessary for transportation;

"\* \* \* \* \*

"(9)   'transportation' includes—

"(A)   a locomotive, car, vehicle, vessel, warehouse, wharf, pier, dock, yard, property, facility, instrumentality, or equipment of any kind related to the movement of passengers or property, or both, by rail, regardless of ownership or an agreement concerning use; and

"(B)   services related to that movement, including receipt, delivery, elevation, transfer in transit, refrigeration, icing, ventilation, storage, handling, and interchange of passengers and property[.]"

■   Thus, the statute explicitly preempts state remedies relating to the physical instrumentalities and services involved in the movement of passengers and property. According to the record before us, a grade crossing, however, does not involve the movement of people or things along the tracks. Instead, it relates to the ability of someone who is not a rail passenger to pass from one side of the railroad tracks to the other. Given the exhaustive list included within the definitional section of the statute and the subject areas that list encompasses, we conclude that a grade crossing is not one of the areas that the statute expressly covers.

■   Along with explicitly preempting state law in the areas set forth above, ICCTA also preempts state laws of general applicability that unreasonably burden rail transportation. *See Emerson v. Kansas City Southern Ry. Co.*, 503 F3d 1126 (10th Cir 2007); *New York Susquehanna v. Jackson*, 500 F3d 238 (3d Cir 2007); and *Green Mountain R.R. Corp. v. Vermont*, 404 F3d 638 (2d Cir), *cert den*, 546 US 977 (2005). Nonetheless, the statute permits "the continued application of laws having a more remote or incidental effect on rail transportation." *Florida East Coast Ry. Co. v. City of West Palm Beach*, 266 F3d 1324, 1331 (11th Cir 2001). The determination of whether state remedies unreasonably burden rail transportation necessarily involves a fact-specific, case-by-case analysis. *See New Orleans & Gulf Coast Ry. Co. v. Barrois*, 533 F3d 321, 332 (5th Cir 2008) ("Section 10501(b) of

the ICCTA may preempt state regulations, actions, or remedies as applied, based on the degree of interference the particular state action has on railroad operations.").

Here, the summary judgment record in this case provides no basis for us to conclude that the grade crossing sought by plaintiffs would impose an unreasonable burden on rail transportation such that the matter would be preempted. *See, e.g., id.* at 332-33 (routine crossing disputes are not typically preempted under ICCTA); *Home of Economy v. Burlington Northern*, 2005 ND 74, ¶¶ 16-17, 694 NW2d 840, 846-47 (ND 2005) (ICCTA does not preempt state law regarding grade crossings); *but see Franks Inv. Co. LLC v. Union Pacific R. Co.*, 534 F3d 443 (5th Cir 2008), *reh'g en banc granted*, 562 F3d 710 (2009).[4] In fact, plaintiffs and their predecessors-in-interest have used the grade crossing at issue for decades with no apparent interference with railroad operations. We thus conclude, based on the record before us, that the remedy at issue has not been demonstrated to place an undue burden on rail transportation. Accordingly, plaintiffs' claims are neither explicitly nor implicitly preempted by ICCTA.

We next turn to the issue of whether, as a matter of law, a prescriptive easement can be established over a federally granted railroad right-of-way. Plaintiffs assert that the law does not preclude them from establishing a nonexclusive right to cross the tracks. Defendant responds that the trial court correctly concluded that the right-of-way is "immune to private prescriptive easements." (Emphasis omitted.) Ultimately, resolution of the issues raised by the parties turns on whether the right-of-way at issue in this case was federally granted and whether a prescriptive easement may be obtained for private benefit over a federally granted right-of-way.

As a general matter, a private party can obtain an easement by prescription over a railroad right-of-way. *See*

---

[4] Defendant relies heavily on the *Franks* decision in support of its contention that the state law remedy in this case is preempted by federal law. However, after defendant's brief was submitted, the Fifth Circuit Court of Appeals granted rehearing of that case *en banc*. In addition, we are unpersuaded by the reasoning of the court in that case.

Byron K. Elliott, 3 *Elliott on Railroads* § 1624, 462 (3d ed 1921) ("It seems to be well settled that a landowner may acquire a right to a private crossing over a railroad right of way by adverse user."); *see also Wehde v. Regional Transp. Authority*, 237 Ill App 3d 664, 673-74, 604 NE2d 446, 453-54 (1992), *appeal den*, 149 Ill 2d 662, 612 NE2d 525 (1993) (it is legally possible to obtain a prescriptive easement for a private drive or access to private property across a railroad right-of-way). However, a railroad right-of-way obtained as the result of a federal land grant is treated differently. *See, e.g., Puett v. Western Pacific R. Co.*, 104 Nev 17, 22, 752 P2d 213, 216-17 (1988) (distinguishing between cases involving private grants of right-of-way and those in which a federally granted right-of-way is at issue).

■    In this case, the railroad obtained a right to the exclusive use and occupancy of the right-of-way land through the 1866 land grant. *See Northern Pacific Ry. v. Townsend*, 190 US 267, 271, 23 S Ct 671, 47 L Ed 1044 (1903) (discussing a virtually identical right-of-way grant, noting that it was "following decisions of th[e] [C]ourt construing grants of rights of way similar in tenor to the grant [then] being considered," and concluding that a limited fee with a right of reverter to the federal government had been granted); *State of Wyoming v. Udall*, 379 F2d 635, 640 (10th Cir), *cert den*, 389 US 985 (1967) ("The concept of 'limited fee' was no doubt applied in *Townsend* because under the common law an easement * * * did not give an exclusive right of possession. With the expansion of the meaning of easement to include, as far as railroads are concerned, a right in perpetuity to exclusive use and possession the need for the 'limited fee' label disappeared."). At the time that the 1866 land grant was passed, the congressional policy was to "subsidiz[e] railroad construction by lavish grants from the public domain." *Great Northern Ry. Co. v. U. S.*, 315 US 262, 273, 62 S Ct 529, 86 L Ed 836 (1942).

Where Congress has granted such an interest, "the right of way was given in order that the obligations to the United States assumed in the acceptance of the act might be performed." *Townsend*, 190 US at 272. In such a case:

> "Manifestly, the land forming the right of way was not granted with the intent that it might be absolutely disposed of at the volition of the company. On the contrary, the grant was explicitly stated to be for a designated purpose, one which negated the existence of the power to voluntarily alienate the right of way or any portion thereof. The substantial consideration inducing the grant was the perpetual use of the land for the legitimate purposes of the railroad, just as though the land had been conveyed in terms to have and to hold the same so long as it was used for the railroad right of way."

*Id.* at 271. Thus, "[t]he whole of the granted right of way must be presumed to be necessary for the purposes of the railroad, as against a claim by an individual of an exclusive right of possession for private purposes[,]" *id.* at 272, and property within that right-of-way may not be obtained by a private party through adverse possession. *Id.*; *see also Phipps v. Stancliff*, 110 Or 299, 312, 222 P 328 (1924) ("[T]itle to the general lands of a railroad company, granted to it by the United States, not including its right of way and similar lands, may be acquired as against the company by adverse possession."). Similarly, the railroad cannot voluntarily alienate portions of the right-of-way. *See Barnes v. Southern Pac. Co.*, 16 F2d 100, 103 (9th Cir 1926), *cert den*, 273 US 766 (1927). However, an easement is a lesser interest than what would be acquired in an action for title by adverse possession. As such, we examine more closely the law with relation to that issue.

■      We observe initially that crossings of a federally granted right-of-way may be obtained for the benefit of the public. In *Townsend*, the Court noted that the railroad's right-of-way over public land is still "amenable to the police power of the state" and that

> "Congress must have assumed when making [land grants], for instance, that in the natural order of events, as settlements were made along the line of the railroad, crossings of the right of way would become necessary, and that other limitations in favor of the general public upon an exclusive right of occupancy by the railroad of its right of way might be justly imposed."

*Townsend*, 190 US at 272. Thus, crossings of a federally granted railroad right-of-way may be obtained for the benefit of the public. *Id.*; *see also Himonas v. Denver & R. G. W. R. Co.*, 179 F2d 171, 174 (10th ed 1949) (since the use the plaintiff sought to establish "was a public and not a private use" it could have been acquired by "condemnation and it follows that they could acquire such easement by grant from the Railroad Company or by prescription"); *Puett*, 104 Nev at 23, 752 P2d at 217 ("there has never been any question that the rights of way granted the private railroad companies are subject to the states' power of eminent domain" for the benefit of the public). Here, however, there is no contention that the crossing sought is for the benefit of the public. On the contrary, it is sought for the benefit of only plaintiffs and their successors-in-interest.

■■   In light of the fact that this case involves a claim of easement by prescription for private use, we must determine whether such an easement would conflict with the railroad's congressionally granted right of exclusive use and control. An easement by prescription, though not a full possessory interest, is, nonetheless, an interest in land. *See Nice v. Priday*, 149 Or App 667, 672, 945 P2d 559 (1997), *rev den*, 327 Or 82 (1998) ("An easement is a nonpossessory interest in the land of another which entitles the holders of an interest in the easement to a private right of way, embodying the right to pass across another's land." (Internal quotation marks omitted.)). Such a property interest in the railroad's right-of-way would appear, on its face, to conflict with the railroad's right to exclusive use and possession of the property for railroad purposes. *See Puett*, 104 Nev at 21-22, 752 P2d at 216-17 (railroad's right to exclusive use and possession does not contain a limitation allowing for private owner to use right-of-way without railroad's consent in a way that does not interfere with railroad's operation); *see also Barnes*, 16 F2d at 103 (Although the railroad company cannot alienate, and others may not acquire, portions of the railroad right-of-way, "revocable licenses are, of course, excluded. In such cases the railroad company never loses its right to possession and control."). Because an easement over a federally granted railroad right-of-way would interfere with a railroad company's congressionally granted right of exclusive use and control, even

when use of the easement did not impede the operation of the railway, we are of the view that such an easement cannot be obtained by prescription.[5] In light of the foregoing, the trial court did not err in concluding that, as a matter of law, plaintiffs could not obtain a private easement over federally granted railroad right-of-way.

■ Finally, we turn to the issue of whether Anderson's interest in the Wolf property predates that of the railroad. If so, the railroad's right-of-way arose out of the deed it obtained from Anderson rather than from the 1866 land grant and, accordingly, the general rule permitting prescriptive easements over railroad rights-of-way would apply. However, if the railroad's interest in the land preceded Anderson's by way of the federal grant, then, as explained above, plaintiffs cannot prevail on their claim for a prescriptive easement for private use.

Plaintiffs assert that Anderson settled on the Wolf property in 1880 and had rights to it from that time, which was before the railroad filed its definite line location in 1882. Therefore, according to plaintiffs, the railroad did not acquire its right-of-way from the 1866 land grant and it follows that the general rule permitting prescriptive easements over railroad right-of-way applies and, thus, they can acquire an easement against the railroad. Defendant responds that mere settlement, in this case, was not sufficient to divest the federal government of the ability to grant the land to another party. For the reasons expressed more fully below, we agree with defendant.

In *Washington & Idaho Railroad v. Osborn*, 160 US 103, 16 S Ct 219, 40 L Ed 346 (1895), the United States Supreme Court considered the rights of a settler who had not filed a preemption claim as against a railroad company seeking to exercise a congressionally granted right-of-way to the property claimed by the settler. It stated:

---

[5] *Cf. BNSF Railway Co. v. Coconino Land and Cattle, LLC*, No 07-8068-PCT-PGR, 2009 WL 806632 at *3 (D Ariz, Mar 26, 2009) (recognizing that the interest sought against the railroad was a license and, therefore, "in fact not an interest in the Subject Right of Way" the court denied the railroad's motion for summary judgment); *Puett*, 104 Nev 17, 23-24, 752 P2d 213, 217-18 (concluding that a license was the appropriate remedy).

> "A settlement upon the public lands in advance of the public surveys is allowed to parties who in good faith intend, when the surveys are made and returned to the local land office, to apply for their purchase. If, within a specified time after the surveys, and the return of the township plat, the settler takes certain steps, that is, files a declaratory statement, such as is required when the surveys have preceded settlement, and performs certain other acts prescribed by law, he acquires for the first time a right of preemption to the land."

*Id.* at 108-09 (quoting *Buxon v. Traver*, 130 US 235, 9 S Ct 509, 32 L Ed 920) (internal quotation marks omitted). In such circumstances, the settler

> "has been permitted by the government to occupy a certain portion of the public lands, and therefore is not a trespasser, on his statement that when the property is open to sale he intends to take the steps prescribed by law to purchase it; in which case he is to have the preference over others in purchasing, that is, the right to preempt it. The United States makes no promise to sell him the land, nor do they enter into any contract with him upon the subject. They simply say to him, if you wish to settle upon a portion of the public lands, and purchase the title, you can occupy any surveyed lands which are vacant and have not been reserved from sale; and, when the public surveys are made and returned, the lands not having been in the meantime withdrawn from sale, you can acquire, by pursuing certain steps, the right to purchase them.
>
> "It must therefore be conceded that [the settler] did not, by maintaining possession for several years and putting valuable improvements thereon, preclude the government from dealing with the lands as its own, and from conferring them on another party by a subsequent grant."

*Id.* at 109 (internal quotation marks omitted). In *Osborn*, the land grant at issue included "an express provision saving the rights of settlers in possession" as it provided that "the legislature of the proper territory [could] provide for the manner in which private lands and possessory claims on the lands of the United States may be condemned[.]" *Id.* In light of that express provision in the land grant at issue, the Court concluded that the settler in *Osborn* was entitled to compensation when the railroad took a right-of-way over the land in his possession.

In contrast, the 1866 land grant contains no such saving provision relating to the right-of-way grant. In *Bybee v. Oregon & California R'd Co.*, 139 US 663, 11 S Ct 641, 35 L Ed 305 (1891), the United States Supreme Court construed the 1866 land grant and noted a contrast between sections 2 and 3 of that law,[6] stating:

> "The distinction between a right of way over public lands [granted in section 3 of the 1866 act], and lands granted [in section 2 of the 1866 act], is important * * *. As to the latter, the rights of settlers or others who acquire the lands by purchase or occupation between the passage of the act and the actual location and identification of the lands, are preserved unimpaired, *while the grant of the right of way is subject to no such condition*[.]"

*Id.* at 679-80 (emphasis added). Accordingly, where a individual's claim to land over which the railroad's right-of-way land "was by virtue of an appropriation or occupation of" that land and "his occupation date[d] only from May, 1879" the individual's "claim was clearly subordinate to that of the railroad company[.]" *Id.* at 680. Thus, when the individual took possession of the land in question, he also undertook the "risk of encroaching upon the right of way which the railroad company might thereafter select for purposes of their road." *Id.*

---

[6] Section 2 of the 1866 land grant provides, in part:

"*And be it further enacted*, That there be, and hereby is, granted to the said companies, their successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line, and to secure the safe and speedy transportation of the mails, troops, munitions of way, and public stores over the line of said railroad, every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile (ten on each side) of said railroad line; and when any of said alternate sections or parts of sections shall be found to have been granted, sold, reserved, occupied by homestead settlers, pre-empted, or otherwise disposed of, other lands, designated as aforesaid, shall be selected by said companies in lieu thereof, under the direction of the Secretary of the Interior, in alternate sections designated by odd numbers as aforesaid, nearest to and not more than ten miles beyond the limits of said first-named alternate sections; and as soon as the said companies, or either of them, shall file in the office of the Secretary of the Interior a map of the survey of said railroad, or any portion thereof, not less than sixty continuous miles from either terminus, the Secretary of the Interior shall withdraw from the sale public lands herein granted on each side of said railroad, so far as located and within the limits before specified."

Ch 262, § 2, 14 Stat 239.

Here, even assuming that the railroad had no right to the property at issue until after the filing of its definite line location,[7] that filing was made prior to the date when Anderson filed his preemption claim. Although Anderson was in possession of the land before the definite line location was filed, Congress retained the right to grant the property to another party. *See Washington*, 160 US at 109 (a settler did not, "by maintaining possession for several years, and putting valuable improvements thereon" preclude the government from conferring land to another party by grant). The 1866 land grant contains no provision for settlers in possession relating to the right-of-way grant. *See Bybee*, 139 US at 680. Thus, pursuant to that grant, the railroad could properly appropriate the property for its right-of-way, and its right to the land subject to the grant was superior to that of Anderson.[8] Accordingly, we conclude that the trial court did not err in holding that the railroad's interest in the right-of-way over the Wolf property predated that of plaintiffs' predecessor-in-interest.

Affirmed.

---

[7] In *Phipps*, 110 Or at 309, the Oregon Supreme Court noted that legal title to lands conveyed by a land grant pass to the railroad "upon the definite location of its line of road."

[8] As noted above, the railroad did, in fact, take Anderson's possible possessory interest into account and obtained a deed from Anderson for a 100-foot right-of-way across the Wolf property.