FILED

09/03/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0569

DA 23-0569

IN THE SUPREME COURT OF THE STATE OF MONTANA

2024 MT 198

SAMUEL J. NELSON, Individually and as Trustee
of the SAMUEL J. NELSON REVOCABLE
TRUST DATED FEBRUARY 9, 2011,

      Petitioner and Appellant,

   v.

MONTANA RAIL LINK, INC., a Montana
Corporation, and BNSF RAILWAY CO., a
Delaware Corporation,

      Respondents and Appellees.

APPEAL FROM:   District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DV-21-1204B
Honorable Rienne H. McElyea, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

         Alanah Griffith, Griffith & Associates, PC,  Big Sky, Montana

      For Appellees:

         Michelle T. Friend, Benjamin O. Rechtfertig, Heder Friend, PLLC,
Billings, Montana

Submitted on Briefs:  May 22, 2024

Decided:  September 3, 2024

Filed:

                   _____
                            Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 Samuel J. Nelson (Nelson) appeals the August 25, 2023 Order on Summary Judgment entered in the Eighteenth Judicial District Court, Gallatin County. We restate the issues on appeal as follows:

> *Did the District Court err when it held, as a matter of law, a private party could not acquire a prescriptive easement over a right of way on a railroad's 1864 federal land grant?*

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 BNSF Railway Company (BNSF) owns a 400-foot wide right of way (ROW) along railroad tracks in Gallatin County near Interstate 90 that was leased by Montana Rail Link, Inc. (MRL), at the time of the District Court's order.[1] The ROW was acquired by BNSF's predecessor, Northern Pacific Railroad Company, pursuant to the Northern Pacific Railroad Company Land Grant Act (1864 Act), signed into law July 2, 1864. 13 Stat. 365 (1864). The 1864 Act granted land for the purpose of building and maintaining the Northern Pacific Railroad—an endeavor that spanned from Lake Superior to Puget Sound. Relevant here, the grant to Northern Pacific Railroad was a 400-foot ROW that extended 200 feet in width on each side of the railroad as it passed through the public domain. In 1987, BNSF's predecessor leased the tracks and ROW to MRL, which operated trains on the tracks until January 1, 2024. Thereafter, BNSF resumed operations.

¶3 Nelson owns property located between the ROW and Interstate 90 in Gallatin County. He began leasing the property in 1982 and obtained title in 1987. Nelson uses his

---

[1] This caption has been changed to correct BNSF's name and place of incorporation.

property for agricultural and recreational purposes and has been accessing his property since 1982 through the ROW. This access has been by dirt road that does not cross the tracks but runs alongside the tracks within the ROW. MRL has been aware of Nelson's use of the ROW to access his property since at least 1985. Over the years, Nelson and MRL exchanged letters and had phone calls discussing the possibility of a written lease or permit for Nelson to use the ROW to access his property. MRL sent Nelson a proposed lease both in 2006 and 2017 that Nelson did not sign as he found the terms unacceptable. Nelson met with representatives of MRL twice in 2015 to discuss Nelson's use of the ROW and the representatives informed Nelson that without a formal lease he was trespassing.

¶4 On June 22, 2017, MRL sent Nelson a letter advising Nelson he was trespassing by using the ROW and that MRL would block access. MRL thereafter installed no trespassing signs, fencing, and placed concrete blocks in the ROW. However, undeterred, Nelson continued to use the ROW to access his property. On June 28, 2021, the Gallatin County Sheriff's Office cited Nelson with criminal trespass. The criminal charges were dismissed on November 10, 2022.

¶5 Nelson filed a petition for declaratory judgment on November 5, 2021, asking for a prescriptive easement over the ROW and damages for interference with the easement. MRL and BNSF denied Nelson had a prescriptive easement and asserted that such an easement would impede rail operations and pose undue safety risks. Both parties filed motions for summary judgment. The District Court determined that a private party could not establish an easement by prescription over a railroad ROW granted pursuant to the

3

1864 Act because the ROWs were for the exclusive use and control of the railroads, with the United States holding a reversionary interest. Nelson appeals the District Court's judgment in favor of MRL and BNSF.

**STANDARD OF REVIEW**

¶6 We review a district court's ruling on motions for summary judgment de novo, using the same M. R. Civ. P. 56 criteria used by the district court. *Chapman v. Maxwell*, 2014 MT 35, ¶ 7, 374 Mont. 12, 322 P.3d 1029. We review a district court's legal conclusions de novo. *Netzer Law Office, P.C. v. State*, 2022 MT 234, ¶ 10, 410 Mont. 513, 520 P.3d 335.

**DISCUSSION**

¶7 We have not previously addressed whether a private party can obtain a prescriptive easement over a railroad ROW granted pursuant to the 1864 Act. In *Renner v. Nemitz*, we declined to rule on the issue since it was not properly preserved for appeal. 2001 MT 202, ¶ 15, 306 Mont. 292, 33 P.3d 255. We begin by examining the unique nature of land grants to railroads in the United States as the West developed.

¶8 In the early to mid-19th century—particularly the period from the Louisiana Purchase in 1803 to the Gadsden Purchase in 1853—this country acquired western lands that "filled out what is now the contiguous United States." *Marvin M. Brandt Revocable Tr. v. United States*, 572 U.S. 93, 95-96, 134 S. Ct. 1257, 1260 (2014). To encourage settlement and development, a fast and reliable method of transportation was needed. The railway provided the answer. However, "[t]he policy of the country [which was focused

4

on the civil war], to say nothing of the supposed want of constitutional power, stood in the way of the United States taking the work into its own hands." *United States v. Union Pac. R.R. Co.*, 91 U.S. 72, 81 (1875). Thus, during the period from 1850 to 1871, Congress, to promote private development of a transcontinental railroad, embarked "on a policy of subsidizing railroad construction by lavish grants from the public domain." *Great N. Ry. Co. v. United States*, 315 U.S. 262, 273, 62 S. Ct. 529, 533 (1942). The federal government "could give away vast swaths of public land—which at the time possessed little value without reliable transportation—in hopes that such grants would increase the appeal of a transcontinental railroad to private investors." *Brandt*, 572 U.S. at 96, 134 S. Ct. at 1261. Examples of these large land grants include the Illinois Central Grant, 9 Stat. 466 (1850); the Union Pacific Grant, 12 Stat. 489 (1862); and the Amended Union Pacific Grant, 13 Stat. 356 (1864). The Northern Pacific Grant, establishing the ROW here under consideration, was one of the largest, conveying an estimated 40,000,000 acres.

¶9     The nature of these grants is at issue here. Ultimately, resolution of the issue turns on whether the federal statute granting the ROW was a pre-1871 or post-1871 Act. In 1871, congressional policy changed, culminating in the passage of the General Railroad Right-Of-Way Act in 1875. 43 U.S.C. §§ 934-939. However, prior to 1871, these private railroad companies were given rights of way over public lands *accompanied* by limited fee land grants along those rights of way. *Brandt*, 572 U.S. at 96-97, 134 S. Ct. at 1261. The statutes conveyed to the railroads a limited fee with an implied condition of reverter to the United States. *Brandt*, 572 U.S. at 102, 134 S. Ct. at 1264. Thus, the railroads acquired

5

more than a mere easement as the land grants had "the attributes of the fee, perpetuity and exclusive use and possession." *New Mexico v. United States Tr. Co.*, 172 U.S. 171, 183, 19 S. Ct. 128, 133 (1898). Accordingly, "[i]n view of this lavish policy of grants from the public domain it is not surprising that the rights of way conveyed in such land grant acts have been held to be limited fees." *Great N. Ry. Co.*, 315 U.S. at 273 n.6, 62 S. Ct. at 533.

¶10 This policy of making generous land grants to the railroads incurred great public disfavor in the late 1860s. Members of Congress argued that the grants conflicted with the goal of the Homestead Act of 1862. Thus, by the early 1870s there was a change in national policy, as exhibited by the following:

> That in the judgment of this House the policy of granting subsidies in public lands to railroads and other corporations ought to be discontinued, and that every consideration of public policy and equal justice to the whole people requires that the public lands should be held for the purpose of securing homesteads to actual settlers, and for educational purposes, as may be provided by law.

Cong. Globe, 42d Cong., 2d Sess., 1585.

¶11 Although recognizing public lands should be reserved for settlers rather than railroads, Congress continued to encourage building a transcontinental railway. Between 1871 and 1875, Congress passed at least 15 special acts granting to railroads a right of way through public lands, without any accompanying limited fee land grant. *Great N. Ry. Co.*, 315 U.S. at 274 n.9, 62 S. Ct. at 534. Thus, the land grant statutes after 1871 did not grant such broad property rights to railroads as the 1864 Act; instead, subsequent statutes granted only an easement without a limited fee in the land. *Great N. Ry. Co.,* 315 U.S. at 271, 62 S. Ct. at 533. The United States Supreme Court thus reasoned the 1875 Act conveyed "a

6

fundamentally different interest than did its predecessor statutes." *Brandt*, 572 U.S. at 106, 134 S. Ct. at 1266.

¶12    Here, the 1864 Act at issue predated the change in congressional policy. The unique nature of a railroad ROW accompanied with a limited fee and an implied reverter to the United States was explained in *Northern Pacific Railway Co. v. Townsend*, 190 U.S. 267, 271, 23 S. Ct. 671, 672 (1903). The Court reasoned:

> The substantial consideration inducing the grant was the perpetual use of the land for the legitimate purposes of the railroad, just as though the land had been conveyed in terms to have and to hold the same so long as it was used for the railroad right of way. In effect the grant was of a limited fee, made on an implied condition of reverter in the event that the company ceased to use or retain the land for the purpose for which it was granted.
>
> Neither courts nor juries, therefore, nor the general public, may be permitted to conjecture that a portion of such right of way is no longer needed for the use of the railroad and title to it has vested in whomsoever chooses to occupy the same. The whole of the granted right of way must be presumed to be necessary for the purposes of the railroad, as against a claim by an individual of an exclusive right of possession for private purposes.

In *Wyoming v. Udall*, 379 F.2d 635, 638 (10th Cir. 1967), the Tenth Circuit explained that in *Great Northern Railway Co.*, 315 U.S. 262, 62 S. Ct. 529, the Supreme Court recognized that in an earlier decision, *Rio Grande Western Railway Co. v. Stringham*, 239 U.S. 44, 36 S. Ct. 5 (1915), it had not considered the 1871 change in congressional policy when it held that there was a limited fee, made on an implied condition of reverter, when there was a post-1871 grant. *See Rio Grande*, 239 U.S. at 47, 36 S. Ct. at 7. Accordingly, the Supreme Court subsequently rejected "the application of the 'limited fee' principle to post-1871 grants, and held that the 1875 right-of-way act granted only an easement with no rights in

7

the underlying oil and minerals." *Udall*, 379 F.2d at 638. The *Udall* court explained that "[t]he concept of 'limited fee' was no doubt applied in *Townsend* because under the common law, an easement was an incorporeal hereditament which did not give an exclusive right of possession. With the expansion of the meaning of easement to include, so far as railroads are concerned, a right in perpetuity to exclusive use and possession, the need for the 'limited fee' label disappeared." 379 F.2d at 639.

¶13    Thus, Congress spoke clearly that in pre-1871 statutes, the railroad received a limited fee, with an implied reverter to the United States. Further, the ROW was for the exclusive use and control of the railroad and a private party's interference through a claim of adverse possession of a portion of the ROW would constitute a form of alienation inconsistent with the purpose and terms of the 1864 Act. "Manifestly, the land forming the right of way was not granted with the intent that it might be absolutely disposed of at the volition of the company. On the contrary, the grant was explicitly stated to be for a designated purpose, one which negated the existence of the power to voluntarily alienate the right of way or any portion thereof." *Townsend*, 190 U.S. at 271, 23 S. Ct. at 672. Thus, a property interest within a ROW granted by the 1864 Act may not be obtained by a private party, just as the railroad may not voluntarily alienate portions of the ROW.

¶14    Importantly, the Court in *Townsend* noted that the railroad's right of way over public land is still "amenable to the police power of the state" and that

> Congress must have assumed when making [land grants], for instance, that
> in the natural order of events, as settlements were made along the line of the
> railroad, crossings of the right of way would become necessary, and that

8

> other limitations in favor of the general public upon an exclusive right of occupancy by the railroad might be justly imposed.

*Townsend*, 190 U.S. at 272, 23 S. Ct. at 673. Thus, crossings of a federal right of way for the benefit of the public, as compared to a private crossing, may be obtained and is subject to a state's inherent power of eminent domain for the benefit of the public. Here, however, the easement is not sought for the benefit of the public; it is sought only for the benefit of Nelson.

¶15 Although Nelson agrees that *Townsend* establishes possessory interests cannot be obtained against federal ROWs granted under the 1864 Act, he argues an easement is a nonpossessory interest that is a lesser interest than what could be acquired by title. Nelson is correct that an easement is a nonpossessory interest in land of another which may entitle the holders of the easement to a right of way. *Wiegele v. W. Dry Creek Ranch, LLC*, 2019 MT 254, ¶ 16, 397 Mont. 414, 450 P.3d 879. However, in *Townsend*, the Court explained that because the 1864 Act granted the railroad the ROW in limited fee with exclusive possession and control, the railroad could not alienate any portion of the ROW and private parties could not acquire property interests. *Townsend*, 190 U.S. at 271, 23 S. Ct. at 672. The railroad company's power to alienate and the power of private parties to acquire interests in the federal land granted to railroads is limited by the purpose for which Congress provided the land grant. *H.A. & L.D. Holland Co. v. N. Pac. Ry. Co.*, 214 F. 920, 927 (9th Cir. 1914). All pre-1871 lands granted were to be under the exclusive possession and control of the railroad for the Act's designated purpose of developing a railway. *Alaska R.R. Corp. v. Flying Crown Subdivision Addition No. 1 & Addition No. 2 Prop. Owners*

9

*Ass'n*, 89 F.4th 792, 796-97 (9th Cir. 2023). This exclusivity includes both possession and control, such that even nonpossessory interests would undermine the railroad's right to exclusive control of the ROW.[2] It is of no consequence that the easement or interest would not interfere with railroad operations because Congress determined exclusive possession and control was necessary for the purpose of the grant to be effectuated. *Townsend*, 190 U.S. at 272, 23 S. Ct. at 673. "The whole of the granted right of way must be presumed to be necessary for the purposes of the railroad, as against a claim by an individual of an exclusive right of possession for private purposes." *Townsend*, 190 U.S. at 272, 23 S. Ct. at 673.

¶16    Other courts considering this issue have concluded similarly. For example, in *Wolf v. Central Oregon & Pacific Railroad, Inc.*, 216 P.3d 316 (Ore. App. 2009), a private party asserted a prescriptive easement over a railroad ROW granted prior to 1871. 216 P.3d at 317-19. The *Wolf* court concluded a prescriptive easement conflicted with the railroad's right of exclusive use and control of the property, relying on *Townsend* and related cases. 216 P.3d at 323 (citing *Puett v. W. Pac. R.R. Co.*, 752 P.2d 213, 216-17 (Nev. 1988); *Barnes*, 16 F.2d at 103). The *Wolf* court then concluded "even when use of the easement did not impede the operation of the railway, we are of the view that such an easement cannot be obtained by prescription." 216 P.3d at 323.

---

[2] This does not mean that no private parties can ever use ROWs, as revocable licenses do not interfere with the railroad's right to exclusive possession and control. *Barnes v. S. Pac. Co.*, 16 F.2d 100, 103 (9th Cir. 1926).

¶17 In addition to Nelson's asserted prescriptive easement interfering with the railroad's right of exclusive use and control, it would also interfere with the United States' reversionary interest in the ROW. We have held "[a] private party cannot obtain a prescriptive easement against the federal government." *Burcalow Family, LLC v. Corral Bar, Inc.*, 2013 MT 345, ¶ 21, 372 Mont. 498, 313 P.3d 182 (citing *Davis v. Hall*, 2012 MT 125, ¶ 34, 365 Mont. 216, 280 P.3d 261); *United States v. Vasarajs*, 908 F.2d 443, 446 n.3 (9th Cir. 1990) ("prescriptive rights cannot be obtained against the federal government"). Thus, a private prescriptive easement is precluded based on the reverter because prescriptive easements run with the land and would burden the federal government's reversionary interest. *See Leichtfuss v. Dabny*, 2005 MT 271, ¶ 37, 329 Mont. 129, 122 P.3d 1220 ("As a general rule, an easement appurtenant attaches to, passes with, and is an incident of ownership of the particular land to which it is appurtenant. In other words, such an easement 'runs with the land,' which means that the benefit or burden passes automatically to successors.") (internal citations omitted).[3]

¶18 Nelson nonetheless urges that subsequent legislative acts have extinguished the federal government's reversionary interest. In 1922, Congress enacted the Abandoned Railroad Right of Way Act (ARRWA), 43 U.S.C. § 912, "to dispose of the abandoned railroad lands to which the United States held a right of reverter under *Townsend*." *Avista Corp. Inc. v. Wolfe*, 549 F.3d 1239, 1243 (9th Cir. 2008). ARRWA "require[ed] that public

---

[3] Recognizing the myriad situations in which private citizens may hold a possessory interest in land in which the federal government has a reversionary interest, we caution that our holding on this point is limited to the specific circumstances of this case—i.e., a claim of prescriptive easement over a pre-1871 railroad land grant.

lands given by the United States for use as railroad rights of way be turned into public highways within one year of their abandonment or be given to the owners of the land traversed by the right of way." *Avista Corp.*, 549 F.3d at 1243.  However, ARRWA was functionally subsumed by the National Trails System Improvements Act of 1988, 16 U.S.C. § 1248, colloquially known as the Rails-to-Trails Act, which reversed the policy of ARRWA and preserved the government's interest in rights of way abandoned after 1988. *Estate of Finnigan v. United States*, 2 F.4th 793, 798 (9th Cir. 2021).  The Rails-to-Trails Act does include a provision that allows a ROW to become a public highway within one year of abandonment, but this occurs after the ROW first reverts to the United States. "[A]ny and all right, title, interest, and estate of the United States in all rights-of-way of the type described in the Act of March 8, 1922, shall remain in the United States upon the abandonment or forfeiture of such rights-of-way."  16 U.S.C. § 1248(c).  Thereafter, the federal government's reversionary interest does not remain if the ROW "is embraced within a public highway" within a year of abandonment.  16 U.S.C. § 1248(c).  Therefore, the ROW reverts to the United States for a period of time whether the ROW later becomes a public highway or not.

¶19    The Rails-to-Trails Act is the operative act here since it applies to any ROWs abandoned after October 4, 1988, and preserves the government's interest in any ROWs abandoned after 1988.  *Estate of Finnigan*, 2 F.4th at 798.  However, here, Nelson asks us to speculate as to what the United States will do with the ROW *if* the railroad abandons it. The ROW has not been abandoned and there is no evidence in the record that it will be

abandoned. Thus, even though the ROW in the future could become a public highway or trail and the federal government's reversionary interest extinguished, it would still first have to be abandoned by the railroad and, next, revert to the federal government before being converted for that purpose. There is likewise no evidence in the record of what the federal government might choose to do with the ROW if the railroad abandons it. Very simply, Nelson's argument does not present an issue ripe for our consideration. *See Havre Daily News, LLC v. City of Havre*, 2006 MT 215, ¶ 19, 333 Mont. 331, 142 P.3d 864 ("The doctrine of ripeness 'requires an actual, present controversy, and therefore a court will not act when the legal issue raised is only hypothetical or the existence of a controversy merely speculative.'") (quoting *Mont. Power Co. v. Pub. Serv. Comm'n*, 2001 MT 102, ¶ 32, 305 Mont. 260, 26 P.3d 91).

**CONCLUSION**

¶20    A private person may not obtain a prescriptive easement over a ROW owned by a railroad that was conveyed pursuant to the 1864 Act. The 1864 Act conveyed a limited fee for the exclusive use and possession of the railroad for railroad operations, subject to a condition of reverter to the United States in the event of the railroad's abandonment. A private prescriptive easement would interfere with railroad operations and burden the federal government's reversionary interest.

¶21    Affirmed.

/S/ LAURIE McKINNON

13

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON
/S/ JIM RICE