**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| ESTATE OF GLOWDENA B. FINNIGAN, *Plaintiff-Appellant*, | No. 19-35922 |
| | D.C. No. 9:18-cv-00109-DLC-KLD |
| v. | |
| UNITED STATES OF AMERICA, *Defendant-Appellee.* | OPINION |

Appeal from the United States District Court
for the District of Montana
Dana L. Christensen, District Judge, Presiding

Argued and Submitted October 28, 2020
Portland, Oregon

Filed June 21, 2021

Before: Susan P. Graber, Richard R. Clifton, and
Sandra S. Ikuta, Circuit Judges.

Opinion by Judge Clifton;
Dissent by Judge Ikuta

# SUMMARY[*]

### Property Rights

The panel affirmed the district court's grant of summary judgment in favor of the United States in an action brought by the Estate of Glowdena B. Finnigan seeking to quiet title to real property that had been granted by the federal government to the Northern Pacific Railroad Company, but was abandoned many years ago.

After Northern Pacific physically abandoned the 20-mile segment in 1958, several landowners along the right of way sought a judicial decree of abandonment, and ultimately gained title to their respective segments of the abandoned railway. The Estate's predecessor-in-interest did not seek a judicial decree of abandonment at that time or for many years thereafter.

At issue is the question whether the United States maintained its reversionary interest over real property granted over 150 years ago to a railroad for use as a right of way, or whether that interest was later ceded to settlers who owned adjoining property. Specifically, the parties dispute whether the current ownership of the abandoned right of way was controlled by the Abandoned Railroad Right of Way Act, codified at 43 U.S.C. § 912 and enacted in 1922, under which title transferred to the adjacent landowners, or by the Rails-to-Trails Act, codified at 6 U.S.C. § 1248(c) and enacted in

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

1988, under which the United States retained its reversionary interest in the land.

Reviewing the history, the plain text of the statutes, and court precedent, the panel concluded that 16 U.S.C. § 1248(c), applied to this parcel and that the United States retained its reversionary interest. Specifically, first, the panel held that when it comes to transferring rights of way to neighboring landowners, abandonment requires both physical abandonment and a judicial decree of abandonment. Second, the panel rejected the Estate's argument that the judicial-decree requirement was met when another parcel that was also within the 20-mile segment of track obtained a judicial decree of abandonment, because that decree did not cover the parcel that the Estate sought to claim in this action. Third, the panel held that § 1248(c) applied, and the right of way at issue reverted to the United States, save for the land used to establish a county road that Sanders County established within the railroad right of way that traversed the Finnigan property in the 1970s.

Judge Ikuta dissented. She would hold that "abandonment" meant physical abandonment, and Northern Pacific physically abandoned its right of way traversing the property at issue in 1958. Because the abandonment occurred before October 4, 1988, *see* 16 U.S.C. § 1248(c), the Finnigan Estate was entitled to the property upon a judicial decree of abandonment.

**COUNSEL**

Timothy M. Bechtold (argued), Bechtold Law Firm PLLC, Missoula, Montana, for Plaintiff-Appellant.

Mark Steger Smith (argued), Assistant United States Attorney, United States Attorney's Office, Billings, Montana, for Defendant-Appellee.

**OPINION**

CLIFTON, Circuit Judge:

This case presents the question of whether the United States maintains its reversionary interest over real property granted over 150 years ago to a railroad for use as a right of way, or whether that interest was later ceded to settlers who owned adjoining property. It is "one of those rare cases evoking episodes in this country's history" that bear repeating, lest they be "remembered as dry facts and not as adventure." *Leo Sheep Co. v. United States*, 440 U.S. 668, 669 (1979).

The Estate of Glowdena B. Finnigan ("Estate") seeks to quiet title to real property that had been granted by the federal government to the Northern Pacific Railroad Company ("Northern Pacific"), but was abandoned many years ago. The right of way traverses land unquestionably owned by the Estate. As will be described in greater detail below, over time Congress changed its policy on how to treat abandoned railroads. The central dispute between the parties is whether the current ownership of the abandoned right of way is controlled by 43 U.S.C. § 912, enacted in 1922, under which

title transferred to the adjacent landowners, or by 16 U.S.C. § 1248(c), enacted in 1988, under which the United States retained its reversionary interest in the land. Reviewing the history, the plain text of the statutes, and our precedents, we conclude that the 1988 statute, § 1248(c), applies to this parcel and that the United States retained its reversionary interest. We thus affirm the district court's grant of summary judgment in favor of the United States.

## I.   Background

In the early 19th century, the United States acquired the territory we now describe as the American West. The California Gold Rush, prompted by discovery of gold at Sutter's Mill in 1848, heightened interest in transcontinental railroads. Construction of those railroads would be expensive and risky, though. After years of "fruitless exhortation," it was evident that "private investors would not move without tangible governmental inducement." *Leo Sheep*, 440 U.S. at 671.

Beginning in 1850, Congress enacted statutes that provided grants of public lands to private railroad companies to subsidize the construction of long stretches of railroads. *See Avista Corp. Inc. v. Wolfe*, 549 F.3d 1239, 1242 (9th Cir. 2008). In 1860, then-presidential candidate Abraham Lincoln proclaimed that "a railroad to the Pacific Ocean [was] imperatively demanded by the interests of the whole country [and] that the Federal Government ought to render immediate and efficient aid in its construction." J. ELY, RAILROADS AND AMERICAN LAW 51 (2001). The Civil War accelerated efforts to develop a network of railroads to facilitate the transportation of troops and supplies. *See Marvin M. Brandt Revocable Tr. v. United States*, 572 U.S. 93, 96 (2014).

In 1864, Congress passed the Northern Pacific Railroad Company Land Grant Act, which gave Northern Pacific a right of way through public lands to construct a railroad and telegraph line from the Great Lakes to the Pacific Coast, specifically from Lake Superior in Minnesota to Puget Sound in Washington. Act of July 2, 1864, 13 Stat. 365. The grant included two hundred feet on either side of the railway for "station buildings, workshops, depots, machine shops, switches, side tracks, turn-tables, and water stations[.]" 13 Stat. at 367. The Act also envisioned significant grants of additional public lands to Northern Pacific, which the company could sell to subsidize the construction of the railroad. *See id*. In 1883, Northern Pacific completed the railroad and celebrated with a "golden spike" ceremony near Gold Creek, Montana, a place now listed on the National Register of Historic Places. By the time of completion, Northern Pacific had claimed forty-five million acres of land grants, which included 23 percent of present-day North Dakota and 15 percent of Montana. P. GATES, HISTORY OF PUBLIC LAND LAW DEVELOPMENT 372–75 (1968) ("PUBLIC LAND").[1]

The right of way at issue in this case is part of an abandoned 20-mile segment of railroad along the south side of the Clark Fork River outside of Noxon, Montana (the "20-mile segment"). Part of that segment runs through the Finnigan property, which itself is entirely within the boundaries of the Kanisku National Forest. The railroad was in use until the 1950s, when Northern Pacific rerouted this

---

[1] These massive land grants were some of the last of their kind. In subsequent years, grants of public land were considered "lavish" and thought to be ripe for abuse and corruption. *See Avista*, 549 F.3d at 1242 (discussing the Credit Mobilier scandal).

stretch of tracks from the south side to the north side of the river in anticipation of the construction of two new hydroelectric dams, the Noxon Rapids Dam and the Cabinet Gorge Dam, which would flood sections of the south side tracks. *See Avista*, 549 F.3d at 1243–44.[2]

The Supreme Court considered the legal nature of the right of way granted to Northern Pacific in *Northern Pacific Railway Co. v. Townsend*, 190 U.S. 267 (1903). It held that Northern Pacific was granted a "limited fee, made on an implied condition of reverter in the event that the company ceased to use or retain the land for the purpose for which it was granted." *Id.* at 271. Upon abandonment of the land for railroad use, the right of way would revert to the United States. *Id*.

After the 1864 grant to Northern Pacific, Congress changed its approach. Until 1871, federal grants generally took the form of "rights of way through the public domain accompanied by outright grants of land[,]" often convened in "checkerboard blocks." *Brandt*, 572 U.S. at 96–97 (citing PUBLIC LAND 362–68). The grants gave railroad companies a limited fee property interest, with the United States retaining a right of reverter if the lands were abandoned. That was the regime that applied to the property at issue in this case. *See N. Pac. Ry. Co.*, 190 U.S. at 271; *Rio Grande W. Ry. Co. v. Stringham*, 239 U.S. 44, 47 (1915).

After 1871, congressional grants of rights of way were limited to easements. *See, e.g.*, *Great N. Ry. Co. v. United*

---

[2] The *Avista* decision concerns another portion of the same Northern Pacific right of way along the Clark Fork River. It provides additional historical background.

*States*, 315 U.S. 262 (1942); *Brandt*, 572 U.S. at 103. That distinction carried legal significance. Rights of way previously granted as limited fee interests vested title to the land in the railroad companies but allowed the United States to reclaim the land upon forfeiture or abandonment. Because the United States maintained a reversionary interest, the railroad companies could not voluntarily transfer their interests, nor could third parties acquire title to the land by way of adverse possession. *Avista*, 549 F.3d at 1242–43. This arrangement effectively kept title to those public lands in the government. However, when Congress changed the nature of the right of way to an easement in 1871, it allowed "full title to that right of way [to] vest in the patentee of the land" upon unilateral abandonment by the railroad company, because that "easement would cease." *Brandt*, 572 U.S. at 105 (internal quotation marks omitted).

In 1922, Congress changed the treatment of abandoned tracks when it passed the Abandoned Railroad Right of Way Act, codified in 43 U.S.C. § 912.[3] Under that provision, title

---

[3] 43 U.S.C. § 912 provides, in a run-on sentence of a kind sometimes found in statutes:

> Whenever public lands of the United States have been or may be granted to any railroad company for use as a right of way for its railroad or as sites for railroad structures of any kind, and use and occupancy of said lands for such purposes has ceased or shall hereafter cease, whether by forfeiture or by abandonment by said railroad company declared or decreed by a court of competent jurisdiction or by Act of Congress, then and thereupon all right, title, interest, and estate of the United States in said lands shall, except such part thereof as may be embraced in a public highway legally established within one year after the date of said decree

to the right of way that would otherwise revert to the government could be transferred to the owner of the land traversed by the abandoned railroad, unless the right of way was within a municipality or had been turned into a public highway (the "public highway exception"). *See* 43 U.S.C. § 912. In particular, the statute provided that a right of way shall be "transferred to and vested in" the adjacent landowner if the railroad company's "use and occupancy of said lands . . . has ceased or shall hereafter cease . . . by abandonment by

---

or forfeiture or abandonment be transferred to and vested in any person, firm, or corporation, assigns, or successors in title and interest to whom or to which title of the United States may have been or may be granted, conveying or purporting to convey the whole of the legal subdivision or subdivisions traversed or occupied by such railroad or railroad structures of any kind as aforesaid, except lands within a municipality the title to which, upon forfeiture or abandonment, as herein provided, shall vest in such municipality, and this by virtue of the patent thereto and without the necessity of any other or further conveyance or assurance of any kind or nature whatsoever: Provided, That this section shall not affect conveyances made by any railroad company of portions of its right of way if such conveyance be among those which have been or may after March 8, 1922, and before such forfeiture or abandonment be validated and confirmed by any Act of Congress; nor shall this section affect any public highway on said right of way on March 8, 1922: Provided further, That the transfer of such lands shall be subject to and contain reservations in favor of the United States of all oil, gas, and other minerals in the land so transferred and conveyed, with the right to prospect for, mine, and remove same.

said railroad company declared or decreed by a court of competent jurisdiction or by Act of Congress." *Id*.[4]

After Northern Pacific physically abandoned the 20-mile segment in 1958, *Avista*, 549 F.3d at 1248, several landowners along the right of way sought a judicial decree of abandonment in accordance with § 912, and they ultimately gained title to their respective segments of the abandoned railway. *See, e.g.*, *Bennett v. United States*, No. 6262-28 (Sanders Cnty., Mont. Nov 25, 1980); *Olson v. Cnty. of Sanders*, No. DV-85-37 (Sanders Cnty., Mont. Oct. 13, 1987); *Noxon Rural Fire Dist. v. Evans*, No. 96-06 (Sanders Cnty., Mont. Nov. 12, 1996).

---

[4] As the relevant committee report explained:

> [A]bandoned or forfeited strips are of little or no value to the Government and [. . .] in rural communities they ought in justice to become the property of the person to whom the whole of the legal subdivision had been granted or his successor in interest. Granting such relief in reality gives him only the land covered by the original patent. The attention of the committee was called, however, to the fact that in some cases highways have been established on abandoned rights of ways or that it might be desirable to establish highways on such as may be abandoned in the future. Recognizing the public interest in the establishment of roads, your committee safeguarded such rights by suggesting the amendments above referred to protecting not only roads now established but giving the public authorities one year's time after a decree of forfeiture or abandonment to establish a public highway upon any part of such right of way.

S. Rep. 388, 67th Cong., 2d Sess. 1 (1922).

The Estate's predecessor-in-interest, Lottie Moore Finnigan, did not seek a judicial decree of abandonment at that time or for many years thereafter. Finnigan had acquired a land patent to the land adjacent to Northern Pacific's right of way in 1922, the same year that Congress enacted § 912. It was not until 1996 that the Estate, under successor Glowdena B. Finnigan, brought a quiet title action against Northern Pacific's successor in interest, the Burlington Railroad Company, and Sanders County, where the property is located ("the 1996 case"). *See Finnigan v. Burlington N. R.R. Co. & Sanders Cnty.*, No. DV-96-46 (Sanders Cnty., Mont. Dec. 10, 1996). The United States was not named as a party to that action.

In the meantime, however, Congress had changed course again. By the 1980s, the struggling railroad industry was abandoning 4,000 to 8,000 miles of railroad per year. In 1983, concerned about the proliferation of abandoned railroads, Congress created a system of "railbanking" to preserve inactive corridors for future use while permitting interim trail use. In 1988, Congress enacted the National Trails System Improvements Act of 1988, colloquially known as the "Rails-to-Trails Act," codified in 16 U.S.C. § 1248(c).[5]

---

[5] 16 U.S.C. § 1248(c) provides:

Commencing October 4, 1988, any and all right, title, interest, and estate of the United States in all rights-of-way of the type described in section 912 of Title 43, shall remain in the United States upon the abandonment or forfeiture of such rights-of-way, or portions thereof, except to the extent that any such right-of-way, or portion thereof, is embraced within a public highway no later than one year after a

As its colloquial name implies, the Rails-to-Trails Act grew out of a movement to convert abandoned railways into recreation areas for hiking, biking, skiing, and snowshoeing. Under § 1248(c), Congress provided that title to a right of way "shall remain" with the United States for railroad rights of way abandoned after October 4, 1988, except to the extent that the right of way was converted to a public highway within one year of abandonment. In effect, § 1248(c) reversed the policy of § 912 and preserved the government's interests in rights of way abandoned after 1988. *Id.*

In 2018, the Estate brought the present action against the United States to quiet its title to the right of way across its property that Northern Pacific stopped using in 1958. The Estate argued that § 912 controlled, because Northern Pacific stopped using the right of way in 1958, even though the railway was not formally declared abandoned before the 1988 enactment of the Rails-to-Trails Act. The federal government disagreed.

The district court held that "abandonment" required both physical abandonment and a judicial or legislative decree of abandonment. Because the right of way at issue was not decreed abandoned until after 1988, the district court concluded that § 1248(c) controlled and that title had reverted to the United States. The district court entered summary judgment in favor of the government. The Estate timely appealed.

---

determination of abandonment or forfeiture, as provided under such section.

## II. Discussion

We have jurisdiction under 28 U.S.C. §1291. We review the grant of a motion for summary judgment *de novo. WildEarth Guardians v. Provencio*, 923 F.3d 655, 664 (9th Cir. 2019).

We begin by looking at the text of the statute. By its terms, the Rails-to-Trails Act applies, starting October 4, 1988, to rights of ways of the kind previously covered by the 1922 statute. The critical passage provides:

> Commencing October 4, 1988, any and all right, title, interest, and estate of the United States in all rights-of-way *of the type described in section 912 of Title 43*, shall remain in the United States upon the *abandonment* or forfeiture of such rights-of-way, or portions thereof . . . .

16 U.S.C. § 1248(c) (emphasis added). A right of way "of the type described in section 912" is one that exists until its forfeiture or abandonment is "declared or decreed by a court of competent jurisdiction or by Act of Congress." 43 U.S.C. § 912.

Thus, the central question is whether the United States had retained an interest in the right of way that traverses the Estate when the Rails-for-Trails Act became effective on October 4, 1988. The resolution of that issue depends, in turn, on whether, a right of way should be deemed "abandoned" when physically abandoned or whether the term "abandonment" requires both physical abandonment and a

judicial decree of abandonment when transferring the land to a neighboring landowner.

## A. Requiring a Decree of "Abandonment"

On *de novo* review, we agree with the district court that when it comes to transferring rights of way to neighboring landowners, abandonment requires both physical abandonment and a decree of abandonment. Section 1248(c) thus controls.

We have already held that "abandonment" of a right of way in this context requires two steps:

> In order for reversionary rights to vest under § 912, the railroad must 1) cease "use and occupancy" of the rights of way *and* 2) abandonment must be "declared or decreed" by a court of competent jurisdiction or a congressional act.

*Vieux v. E. Bay Reg'l Park Dist.*, 906 F.2d 1330, 1337 (9th Cir. 1990). That conclusion was driven by § 912's requirement that "forfeiture or by abandonment by said railroad company [be] declared or decreed by a court of competent jurisdiction or by Act of Congress." 43 U.S.C. § 912. Only "then and thereupon [shall] all right, title, interest, and estate of the United States . . . be transferred" to the adjoining landowner. *Id.* We took these provisions to impose a two-step requirement, both physical abandonment and a judicial or congressional decree recognizing it. *See Vieux*, 906 F.2d at 1337.

We later applied that two-step test in *Avista*, a case involving another portion of the same right of way along the Clark Fork. We emphasized that both steps had to have been accomplished before the property would qualify as abandoned for the purpose of transferring it to neighboring landowners:

> *Vieux* underscored that for any reversionary property rights to vest, the use and occupancy of the land must have ceased by abandonment or forfeiture *and* the abandonment or forfeiture must have been declared by Congress or a court of competent jurisdiction.

*Avista*, 549 F.3d at 1246–47.

Perhaps recognizing our precedent that abandonment requires two steps, including a judicial decree or congressional declaration, the Estate argues that § 1248(c) should be interpreted to require that only the first step, the physical abandonment, needed to have occurred before October 4, 1988. Under that reading, the second step could be accomplished at any point thereafter, including through the current action brought by the Estate to quiet its title to the property in question, now more than sixty years after its physical abandonment and more than thirty years after the enactment of § 1248(c).

That approach is not consistent with the text of § 1248(c), however. If it were any railroad right of way, regardless of what § 912 provided, § 1248(c) could just say "railroad right of way," but it does not. Because the Estate did not seek a formal decree or declaration of abandonment until much later, "all right, title, interest, and estate of the United States" in the

right of way was retained by the United States, regardless of whatever inchoate interest the Estate may previously have had. 43 U.S.C. § 912. Starting October 4, 1988, the Rails-to-Trails Act required that "any and all right, title, interest, and estate of the United States" so retained under § 912 "remain in the United States." 16 U.S.C. § 1248(c). It does not say that such interests will remain with the United States until the adjoining landowner finally takes action to obtain a judicial or congressional decree under § 912, nor does it suggest that there is anything limited or temporary about the rights retained by the United States. The Estate's preferred interpretation is thus foreclosed by a plain reading of § 1248(c).

The Estate's approach is also inconsistent with Congress's purpose in enacting § 1248(c): to retain title to thousands of miles of rights of way to convert to recreational trails, at a time when abandoned railroads were proliferating throughout the country. If Congress had determined to limit the reach of § 1248(c) only to physical abandonments occurring after October 4, 1988, or to permit adjoining landowners to obtain the judicial or congressional decrees required under § 912 at any date into the future – thus allowing abandoned but yet unclaimed parcels to remain in limbo – it could, and presumably would, have said so.

## B.  Requiring Parcel-Specific Determinations

The Estate argues that even if § 1248(c)'s two-step requirement applies, the judicial-decree requirement was met when another parcel that was also within the 20-mile segment of track abandoned by the Northern Pacific in 1958 obtained a judicial decree of abandonment. The Estate cites, for example, a judgment issued by the state district court in 1980

concerning an action brought by landowner David Bennett to quiet title to the right of way that crossed property that he owned. *See Bennett*, No. 6262-28. It appears that the federal government within that action disclaimed any interest in that property. By its express terms, however, the judicial decree in that case was limited to the precise parcel for which the plaintiffs there quieted title. It did not cover the parcel that the Estate seeks to claim in this action.

A judicial decree of abandonment is particular to the parcel at issue and to the parties in the case. The *Bennett* case might serve as evidence that the railroad company's use of the right of way ended around 1958, but that fact, satisfying the first step, is not in dispute. The case cannot satisfy the requirement of the second step, that "the abandonment or forfeiture must have been declared by Congress or a court of competent jurisdiction." *Avista*, 549 F.3d at 1246–47. A particularized declaration of abandonment is necessary to put the public on notice. *See id.* at 1250. From that point, the clock starts running for state and local governments to claim the property for other permitted uses, such as building a public highway. *See id.* at 1250 n.11. If a single declaration could apply to an entire railroad line, it would not provide local governments adequate opportunity for parcel-specific factual development and could impede determinations about the continuing usefulness of particular segments of the right of way.

The Estate did seek a judicial decree concerning its property in 1996. Although that case was specific to the parcel at issue, it failed to name the United States as a defendant, and it brought no claims under the Quiet Title Act, codified in 28 U.S.C. § 2409a, as would normally be required to affect a federal interest in real property. We need not

decide the effect of those elements of the 1996 decree, however, as that decree suffers from a more important defect. It was brought years after the 1988 enactment of § 1248(c), and by that time the statute provided that title to the abandoned right of way would remain with the federal government, except for any portion that had been taken for a public highway.

## C.  The County Road

In the 1970s, Sanders County established a county road within the railroad right of way that traverses the Finnigan property. The Estate claims that the public highway exception is not at issue here because, in the 1996 case, Finnigan granted a 60-foot right of way to Sanders County for the road in consideration for the County's agreement not to take any further action to establish public roads, highways, or facilities.

As we noted in *Avista*, "[under] the normal sequence of events, the entry of a final judgment declaring the right of way abandoned under § 912 would serve to commence the time period during which the highway exception could be established by the creation of a public road." 549 F.3d at 1251. However, in this case, as in *Avista*, the public road had already been established before the declaration of abandonment. Nevertheless, in *Avista*, we determined that under the § 912 scheme, even if the landowners' inchoate reversionary interests vested with the entry of a judicial decree of abandonment, they would be "immediately divested by the existence of a previously established public road." *Id.* The same would hold true for the 1996 case, if § 912 applied.

However, § 1248(c) does not require that the United States obtain a formal decree of abandonment. Thus, we conclude that any portion of the right of way dedicated to public road use transfers to Sanders County because § 1248 provides that title reverts to the United States except "to the extent that any such right of way, or portion thereof, is embraced within a public highway." *Accord Avista*, 549 F.3d at 1251 (comparing the highway exceptions under § 912 and § 1248(c)).

We thus conclude that § 1248(c) applies, and the right of way at issue reverts to the United States, save for the land used to establish a county road.

## III.     Conclusion

We affirm the district court's grant of summary judgment in favor of the United States.

**AFFIRMED.**

---

IKUTA, Circuit Judge, dissenting:

This case presents a straightforward question of statutory interpretation. The majority merely had to interpret the meaning of "abandonment" as that term is used in 16 U.S.C. § 1248(c). If we use the dictionary definition of the term, "abandonment" means physical abandonment. Using that definition, the Northern Pacific Railroad Company abandoned its right of way traversing the property at issue in 1958. Because the abandonment occurred before October 4, 1988, *see* 16 U.S.C. § 1248(c), the Finnigan Estate is entitled

to the property upon a judicial decree of abandonment. The majority errs by relying on cases construing a different statute, failing to address the text of § 1248(c), and failing to explain how its construction of § 1248(c) makes sense in light of the overall statutory scheme. Therefore, I dissent.

I

A

The issue in this case arises because Congress has enacted two separate schemes for the disposition of railroad rights of way that the United States granted to railroad companies and that reverted to the United States when the railroad companies no longer needed them.

In 1864, Congress enacted the Northern Pacific Railroad Company Land Grant Act of 1864 (the 1864 Act), which granted Northern Pacific a right of way over public land from Lake Superior to the coast of Washington state. *Avista Corp. Inc. v. Wolfe*, 549 F.3d 1239, 1242 (9th Cir. 2008). The Supreme Court held that the 1864 Act gave Northern Pacific a limited fee interest in the public land with "an implied condition of reverter." *See N. Pac. Ry. Co. v. Townsend*, 190 U.S. 267, 271 (1903). Under ordinary principles of property law, if Northern Pacific "ceased to use or retain the land for the purpose for which it was granted," the land would automatically revert to the United States. *See id.*; *see also Avista*, 549 F.3d at 1242.

Congress has adopted two approaches for dealing with the rights of way that revert to the United States upon abandonment.

First, in 1922, Congress enacted the Abandoned Railroad Right of Way Act, codified at 43 U.S.C. § 912.[1] Section 912 addresses the situation when "public lands of the United States have been or may be granted to any railroad company for use as a right of way" and the "use and occupancy of said lands for such purposes has ceased." 43 U.S.C. § 912. Under *Townsend*, such a cessation of use automatically causes the property to revert to the United States. *See* 190 U.S. at 271. If the railroad company's cessation of use is "declared or decreed by a court of competent jurisdiction," then a further transfer is triggered. 43 U.S.C. § 912. As stated in § 912, "then and thereupon all right, title, interest, and estate of the

---

[1] 43 U.S.C. 912 reads:

> Whenever public lands of the United States have been or may be granted to any railroad company for use as a right of way for its railroad or as sites for railroad structures of any kind, and use and occupancy of said lands for such purposes has ceased or shall hereafter cease, whether by forfeiture or by abandonment by said railroad company declared or decreed by a court of competent jurisdiction or by Act of Congress, then and thereupon all right, title, interest, and estate of the United States in said lands shall, except such part thereof as may be embraced in a public highway legally established within one year after the date of said decree or forfeiture or abandonment be transferred to and vested in any person, firm, or corporation, assigns, or successors in title and interest to whom or to which title of the United States may have been or may be granted, conveying or purporting to convey the whole of the legal subdivision or subdivisions traversed or occupied by such railroad or railroad structures of any kind as aforesaid.

43 U.S.C. § 912.

United States in said lands shall . . . be transferred to and vested in any person" to whom the United States previously granted the property that was traversed by the right of way. *Id*.[2]

Many years later, in 1988, Congress adopted a different scheme applicable to "railroad rights of way abandoned after October 4, 1988." *Avista*, 549 F.3d at 1243 n.2. In the National Trails System Improvements Act of 1988, Congress provided that the United States' reversionary interest in railroad rights of way "shall remain in the United States upon the abandonment or forfeiture of such rights-of-way" after October 4, 1988. 16 U.S.C. § 1248(c).[3] Unlike § 912, § 1248(c) does not mention a judicial decree of abandonment

---

[2] Congress made a number of exceptions to this disposition, including for any part of a right of way "embraced in a public highway legally established within one year after the date of said decree or forfeiture or abandonment." 43 U.S.C. § 912.

[3] The entire provision reads:

> Commencing October 4, 1988, any and all right, title, interest, and estate of the United States in all rights-of-way of the type described in section 912 of Title 43, shall remain in the United States upon the abandonment or forfeiture of such rights-of-way, or portions thereof, except to the extent that any such right-of-way, or portion thereof, is embraced within a public highway no later than one year after a determination of abandonment or forfeiture, as provided under such section.

16 U.S.C. § 1248(c).

or require the United States to obtain one in order to retain its reversionary interest.[4]

In short, Congress enacted two schemes for disposing of the United States' reversionary interest in abandoned railroad rights of way, both of which are still in effect. Under § 912, the United States' reversionary interest is generally transferred to certain private landowners if they obtain a judicial decree of abandonment. But under § 1248(c), the United States retains its reversionary interest (without any judicial decree being required) for any right of way abandoned after October 4, 1988. Because § 1248(c) did not repeal § 912, both schemes remain in effect today.

B

The question here is which statute, § 912 or § 1248(c), applies to the right of way traversing the Finnigan property. The right of way that traverses the Finnigan property is part of a much longer 20-mile segment of right of way along the Clark Fork River. The key dates are not in dispute. Northern Pacific ceased to use the 20-mile segment of the right of way for railroad purposes in 1958. *See Avista*, 549 F.3d at 1247. Although other landowners whose property was traversed by the 20-mile segment obtained judicial decrees of abandonment, Finnigan did not. The Finnigan Estate finally filed a quiet-title action in district court against the United States in 2018. The district court held that § 1248(c) applied to the right of way because no judicial decree of abandonment

---

[4] Section 1248(c) creates an exception for any right of way "embraced within a public highway no later than one year after a determination of abandonment or forfeiture, as provided" under the 43 U.S.C. § 912. 16 U.S.C. § 1248(c).

had been issued prior to October 4, 1988. Therefore, the court ruled that the United States retained the reversionary interest in the right of way.

The majority now affirms the district court's decision based on the following reasoning. According to the majority, the term "abandonment" in § 1248(c) means "both physical abandonment and a judicial or congressional decree recognizing it." Majority at 13–14. Because the Finnigan Estate did not obtain a judicial decree before October 4, 1988, the majority reasons, the right of way was not abandoned before that date, and so § 1248(c) necessarily applies.

C

In ruling that abandonment means "both physical abandonment and a judicial or congressional decree recognizing it," the majority ignores the statutory text of § 1248(c) and the overall statutory scheme involving abandoned railroad rights of way; it therefore reaches an erroneous result.

As always, we must start with the statutory text. *See BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004). Section 1248(c) provides that "any and all right, title, interest, and estate of the United States in all [railroad] rights-of-way of the type described in section 912 of title 43, shall remain in the United States upon the abandonment or forfeiture of such rights-of-way, or portions thereof . . . ." 16 U.S.C. § 1248(c). The statute does not define abandonment, so we consider its "ordinary, dictionary meaning." *See In re Roman Cath. Archbishop of Portland in Or.*, 661 F.3d 417, 432 (9th Cir. 2011). We frequently consider both "popular dictionaries," *Metro One Telecomms., Inc. v. Comm'r*,

704 F.3d 1057, 1061 (9th Cir. 2012), and Black's Law Dictionary, *see Ariz. Health Care Cost Containment Sys. v. McClellan*, 508 F.3d 1243, 1250 n.9 (9th Cir. 2007).

"Abandonment" is defined as "relinquishment by a nonuser." *Abandonment*, Webster's Third New International Dictionary 2 (1961). This dictionary definition is consistent with the legal definition: "relinquishing of or departing from . . . with the present, definite, and permanent intention of never returning or regaining possession." *Abandonment*, Black's Law Dictionary (11th ed. 2019). Thus, the plain meaning of abandonment is physical abandonment. Using this plain meaning, § 1248(c) provides that when a right of way is physically abandoned after October 4, 1988, the United States retains its reversionary interest.

Under our precedent, "[u]nless the plain meaning leads to an absurd or unreasonable result, which it does not here, our judicial inquiry is at an end." *United States v. King*, 244 F.3d 736, 740 (9th Cir. 2001) (cleaned up). It is more than reasonable to use the plain meaning of "abandonment" here. The interest in a right of way automatically reverts to the United States when a railroad company physically abandons it. *See Townsend*, 190 U.S. at 271. Therefore, under § 1248(c), when a railroad physically abandons a right of way after October 4, 1988, the United States retains its interest in the right of way. Congress could reasonably conclude that the United States would not need to obtain a judicial decree of abandonment in order to retain the reversionary interest it already possessed under *Townsend*. Therefore, it makes sense to read § 1248(c) as applying upon physical abandonment of a right of way, not upon the issuance of a judicial decree (which § 1248(c) does not mention).

By contrast, under § 912, Congress provided that a private landowner could not claim interest in part of an abandoned right of way without some judicial action. This also makes sense: Congress could reasonably conclude that a third party should not be able to claim that a right of way traversing its property was abandoned by the railroad without some judicial review and approval.

Nor does the context of § 1248(c) require a different interpretation. *See BedRoc Ltd.*, 541 U.S. at 185 (considering a word's statutory context to confirm its ordinary meaning). Rather, interpreting "abandonment" according to its dictionary definition avoids redundancies in § 1248(c). *See Rimini St., Inc. v. Oracle USA, Inc.*, 139 S. Ct. 873, 881 (2019). Section 1248(c), for example, carves out an exception for public highways created "no later than one year after a determination of abandonment." 16 U.S.C. § 1248(c). It would be redundant for Congress to refer, in the same provision, to an "abandonment" and a "determination of abandonment" if the word abandonment necessarily included obtaining a judicial decree (i.e., a determination) of abandonment. Similarly, § 912 creates an exception for any part of a right of way "embraced in a public highway legally established within one year" of a "decree or . . . abandonment." 43 U.S.C. § 912. Again, it would be redundant for Congress to refer to a "decree . . . or abandonment" if the word "abandonment" necessarily included a decree. These redundancies are a "clue" that the proper interpretation of abandonment in § 1248(c) is physical abandonment. *Rimini St.*, 139 S. Ct. at 881.

Because the best interpretation of "abandonment" is physical abandonment, § 1248(c) is applicable only when the physical abandonment of a right of way described in § 912

occurs after October 4, 1988. Because there is no dispute that Northern Pacific abandoned the right of way at issue well before October 4, 1988, § 1248(c) is simply not applicable here.

## II

The majority does little to justify its contrary holding. Instead of interpreting the text of § 1248(c), the majority relies on cases construing a different statute, § 912. *See* Majority at 14 (citing *Avista*, 549 F.3d at 1246–47; *Vieux v. E. Bay Reg'l Park Dist.*, 906 F.2d 1330, 1337 (1990)). This reliance is misplaced. Unlike § 1248(c), § 912 explains the conditions under which the United State's reversionary interest in a right of way is deemed to be transferred to a private landowner whose property is traversed by the right of way. As *Vieux* and *Avista* explain, before a private landowner can claim this reversionary interest, "the railroad must 1) cease 'use and occupancy' of the rights of way *and* 2) abandonment must be 'declared or decreed' by a court of competent jurisdiction or a congressional act." *Vieux*, 906 F.2d at 1337 (emphasis in original). This two-step process makes sense in the § 912 context: there must be a physical abandonment, which causes the property to automatically revert to the United States, and then there must be a judicial ruling for the reversionary interest in the right of way to vest in the relevant landowner. *See Avista*, 549 F.3d at 1246–47 (reiterating that "for any reversionary property rights to vest, the use and occupancy of the land must have ceased by abandonment or forfeiture *and* the abandonment or forfeiture must have been declared by Congress or a court of competent jurisdiction").

But our analysis of § 912 in these cases clearly does not apply to either the language or purpose of § 1248(c). In fact, construing "abandonment" to mean "both physical abandonment and a judicial or congressional decree recognizing it" in § 1248(c), Majority at 14, would have an absurd result. Because § 1248(c) provides that the reversionary interest "shall remain in the United States upon the abandonment or forfeiture of such rights-of-way," the majority's interpretation would require the United States to obtain a judicial decree in order to claim its reversionary interest in abandoned rights of way. This reading is contrary to *Townsend*, which held that interest in an abandoned right of way automatically reverts to the United States. *Townsend*, 190 U.S. at 271.

In fact, the majority's interpretation of "abandonment" to mean "both physical abandonment and a judicial or congressional decree recognizing it" does not even make sense when applied to § 912. If the word "abandonment" necessarily included obtaining a declaration or decree of abandonment, it would not be necessary to state that a landowner can claim the right of way only if "the use and occupancy of the land . . . ceased by abandonment or forfeiture *and* the abandonment or forfeiture [was] declared by Congress or a court of competent jurisdiction." *Avista*, 549 F.3d at 1246–47. Rather than a two-step process, a one-step process would suffice. The majority fails to explain—or even discuss—the problems with its interpretation.[5]

---

[5] The majority's interpretation of the phrase "all rights-of-way of the type described in section 912 of title 43" in § 1248(c) as referring to a right of way "that exists until its forfeiture or abandonment is 'declared or decreed by a court of competent jurisdiction or by Act of Congress,'" Majority at 13, provides no support for its argument that "abandonment"

Finally, the majority claims that interpreting abandonment to mean physical abandonment is "inconsistent with Congress's purpose in enacting § 1248(c):  to retain title to thousands of miles of rights of way . . . at a time when abandoned railroads were proliferating throughout the country."  Majority at 16.  "But policy arguments cannot supersede the clear statutory text."  *Universal Health Servs., Inc. v. United States*, 136 S. Ct. 1989, 2002 (2016).[6]  Moreover, the majority's policy concerns are misplaced.  As the Supreme Court has explained, by the late 1980s experts had predicted that approximately 3,000 miles of railroad would be physically abandoned every year through the end of the twentieth century.  *See Preseault v. ICC*, 494 U.S. 1, 5 (1990).  Interpreting § 1248(c) consistent with the plain meaning of abandonment would therefore leave plenty (as much as 36,000 miles by 2000 alone) of physically abandoned railroad for the government to reclaim after October 4, 1988.

\*\*\*

means "both physical abandonment and a judicial or congressional decree recognizing it," Majority at 14.  Under *Townsend*, the reversionary interest in a right of way (however it is defined) automatically vests in the United States once the railroad company has *physically* abandoned it.  *See* 190 U.S. at 271.  Under § 1248(c), such a right of way remains in the United States only if it was abandoned after October 4, 1988.  *Avista*, 549 F.3d at 1243 n.2.

[6] Contrary to the majority, the text of § 912 does not put any time limit on when adjoining landowners may obtain judicial or congressional decrees for physically abandoned parcels; therefore, Congress *did* expressly permit "adjoining landowners to obtain the judicial or congressional decrees required under § 912 at any date into the future."  Majority at 16.

Because the term "abandonment" in § 1248(c) means physical abandonment, and Northern Pacific physically abandoned the property at issue well before October 4, 1988, § 1248(c) is not applicable here. Instead, § 912 applies, and the Finnigan Estate should take title to the right of way at issue here whenever a court of competent jurisdiction declares that it has been abandoned. The government concedes that federal courts are courts of competent jurisdiction for purposes of § 912. Thus, I would reverse and remand to the district court with instructions to declare the Finnigan right of way abandoned and quiet title to the Finnigan Estate.